# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 20-cv-01792 |
| | ) | |
| v. | ) | No. 13 CR 576[1] |
| | ) | Judge Robert M. Dow, Jr. |
| MIGUEL GUZMAN, | ) | |
| | ) | |
| Defendant. | ) | |

## EMERGENCY MOTION FOR COMPASSIONATE RELEASE

## FROM BOP FCI ELKTON, OHIO (COVID-19)

Defendant, **MIGUEL GUZMAN**, by and through his attorneys, **THOMAS ANTHONY DURKIN** and **JOSHUA G. HERMAN**, respectfully moves this Court, pursuant to 18 U.S.C. § 3582(c)(1)(A)(i) and 18 U.S.C. § 3553(a), for its order granting him immediate compassionate release from FCI Elkton, Ohio, a BOP facility that cannot safely control the outbreak of the 2019 novel coronavirus (COVID-19).

In support of this motion, Defendant, through counsel, shows to the Court the following:

1. Mr. Guzman is almost 67-year-old high-risk medical inmate in the custody of the Bureau Prisons at its now-infamous FCI Elkton, Ohio, pursuant to this Court's sentence of October 23, 2015. According to the BOP's own statistics, as of writing, at least six inmates have died in Elkton due to COVID-19, and at least 34 staff members and 39 inmates have tested positive for the incurable virus.[2] There have been two inmate deaths in the very area in which Mr. Guzman is

---

[1] This motion is filed in Case No. 20-cv-01792 pursuant to the Court's Second Amended General Order 20-0012 dated March 30, 2020.

[2] *See* https://www.bop.gov/coronavirus/ (last visited Apr. 16, 2020).

confined, one as recent as last night. In plain point of fact, FCI Elkton has proven it cannot safely protect a high-risk inmate such as Mr. Guzman.

2. Aside from his advanced age, Mr. Guzman also suffers from high blood pressure and hyperlidemia (high cholesterol), which medically puts him at increased risk of death or serious illness from COVID-19, pursuant to the CDC guidelines.[3] He also has a supportive family who have crafted a release plan that will facilitate Mr. Guzman's transfer.[4]

3. The risks to Mr. Guzman's life and health are heightened at FCI Elkton due to the particularly rampant and deadly COVID-19 outbreak in that institution. On April 13, 2020, the ACLU of Ohio filed a lawsuit seeking an Emergency Writ of Habeas Corpus and other relief in the Northern District of Ohio. (Case No. 4:20-cv-00794). A copy of the complaint is attached

---

[3] We described Mr. Guzman's health issues in detail in his sentencing memorandum in 2015 (Dkt. #245, p. 10):

> Mr. Guzman was diagnosed with hyperlipidemia on December 30, 2012, and is prescribed Simvastatin, a cholesterol medication, which he must take daily. (PSI, 14). He has also had positive fecal occult blood cards at his annual colo-rectal cancer screening, and has had an umbilical hernia since at least 2005. A lab test for the hernia has been recently ordered (June 15, 2015). (PSI, 14). As Mr. Guzman's health condition worsens, his treatment and care will pose additional costs to the Bureau of Prisons, as even with a ten-year sentence he is likely to remain in custody until he is seventy-years old. With this type of health history the risk of his dying the Bureau of Prisons and/or requiring extensive medical treatment and care is all but certain. Additionally, his large, loving family will have a diminished opportunity and role in caring for him. In this instance where there are many family members capable and willing to provide Guzman with both emotional and financial support, the most effective medical care for Guzman would be found outside the Bureau of Prisons.

[4] Mr. Guzman's family's plan would be for Mr. Guzman to stay at his permanent residence where his wife still lives at her home at S. Richmond Ave in Chicago, IL. It is a three bedroom and two bathroom house that would have ample space for him to isolate or quarantine. Mr. Guzman's youngest daughter is also currently living there and can help care for him. His wife is retired, and his daughter is working from home. He would have his own room and could be away from them if necessary. The house can also accommodate electronic monitoring.

hereto as Exhibit A, and the factual allegations, including in its declarations, are incorporated herein as if fully set forth.

4. Moreover, the urgency of Mr. Guzman's circumstances is also reflected in Attorney General Barr's Memorandum of April 3, 2020, which directly provides that the Bureau of Prisons is to "Immediately Maximize Transfers to Home Confinement of All Appropriate Inmates" held at FCI Elkton. A copy of that Memorandum, along with Attorney General Barr's March 26, 2020, memo that is referenced in the April 3, 2020, memo, are together attached as Exhibit B. Attorney General Barr specifically identified FCI Elkton as one of the three BOP institutions that is unfortunately experiencing "significant levels of infection." Attorney General Barr has directed that home confinement be used "with dispatch…" to move vulnerable inmates out of these institutions. Being almost 67 years old and having existing medical conditions that put him at additional medical risk, Mr. Guzman should certainly qualify as one of those vulnerable inmates.

5. In fact, immediately after Attorney General Barr's April 3rd memo, Mr. Guzman was moved to isolation and told by a correctional officer that he was going home if he cleared the requisite fourteen-day quarantine. This would have had Mr. Guzman leaving for home as early as tomorrow, Friday, April 17, 2020. However, Mr. Guzman was instead sent back to his area without explanation on Friday April 10, 2020, having been isolated only seven days. Based on conversations that counsel has had with Mr. Guzman's family, counsel understands that he was not given any reasons, and was simply sent back to his area. He was not told whether the Warden had decided against releasing him pursuant to Attorney General Barr's memorandum, or that he somehow had not cleared the quarantine.

3

6.      Mr. Guzman has confirmed to family members in recent emails and telephone calls how badly the conditions at FCI Elkton have deteriorated. He has described the deaths of the two inmates in his area, countless sick inmates in his area, and social distancing as all but impossible. Mr. Guzman has also reported to his family that when he was taken to isolation for quarantine, he had to leave behind the soap and other items that he had gathered from the commissary to protect himself. Now the commissary has been closed; and, therefore, he has not been able to re-purchase any items to try to ensure even a modicum of personal safety.

7.      Mr. Guzman has already served over 6.5 years in BOP custody, which is slightly over 50% of his sentence of 150 months. As this Court is aware, Mr. Guzman pled guilty and has long acknowledged his mistakes; and the crime for which he was convicted was a non-violent drug offense. The Court, in fact, departed from the guidelines, in part due to Mr. Guzman's ill health and age, such that he would not effectively be serving a life sentence.

8.      Considering that the Court expressly indicated that it did not want Mr. Guzman to get an effective life sentence, he should not now risk an effective death sentence or go through the agony of fearing that he will die in prison. He is not a terrorist, sex offender or some other violent offender. He was involved in drug crimes in addition to owning and operating his auto-mechanic's garage. He is also a father, and a very decent man. Mr. Guzman's sentence should now either be reduced to time served or he should be allowed to complete the remainder of his sentence at home, in the care of his incredibly supportive family—or some combination of each alternative within the Court's authority to grant under these circumstances. Unless compassionate release is granted, considering the ever-worsening conditions in the BOP and Elkton specifically, our fear articulated in our sentencing memo might come true from an unforeseeable source. As we said then, and say now: "Mr. Guzman is a kind, hard-working man, who is devoted to his family who is unworthy of

dying in prison. He is a first-time offender who has pleaded guilty, accepted responsibility and admitted his wrongdoing."

9. The COVID-19 pandemic positions Mr. Guzman at a grave risk of death due to his age and his already sensitive health condition. As of Thursday, April 16, 2020, BOP reported the following numbers: 473 inmates infected with COVID-19 (doubled from last week); 279 staff infected with COVID-19; and, 18 inmate deaths due to COVID-19 (doubled from last week).[5] FCI Elkton, where Mr. Guzman is, has a severe outbreak and has startling numbers on its own, accounting for 1/3rd of the total deaths in the COVID-19-related Bureau of Prisons: 39 inmates infected with COVID-19; 34 staff infected with COVID-19; and 6 inmate deaths due to COVID-19. Further, these numbers are likely underreporting the actual amount of infected inmates and staff, due to the lack of testing available. The situation in the BOP will get worse, and multiple COVID-19 related deaths reported by the Bureau of Prisons in this week alone were indeed inmates at FCI Elkton. *Two weeks ago*, a federal district court in the Eastern District of Pennsylvania ordered compassionate release for an inmate at FCI Elkton who was serving a mandatory minimum sentence and observed as follows regarding the dire circumstances at the facility:

> Given Mr. Rodriguez's vulnerability to COVID-19, prison is a particularly dangerous place for him. COVID-19 is now inside FCI Elkton. Many of the recommended measures to prevent infection are impossible or unfeasible in prison. The government's assurances that the BOP's "extraordinary actions" can protect inmates ring hollow given that these measures have already failed to prevent transmission of the disease at the facility where Mr. Rodriguez is housed. *See* Resp. Br. 10. Indeed, Congress and the Department of Justice are increasingly

---

[5] See https://www.bop.gov/coronavirus/.

> recognizing the danger of COVID-19 outbreaks in prison and encouraging steps to release some inmates. *See infra* at 18.
>
> Prisons are ill-equipped to prevent the spread of COVID-19. Public health experts recommend containing the virus through measures such as social distancing, frequently disinfecting shared surfaces, and frequently washing hands or using hand sanitizer

*United States v. Rodriguez*, No. 2:03-cr-00271-AB-1, 2020 U.S. Dist. LEXIS 58718, at *21 (E.D. Pa. Apr. 1, 2020). The Court further observed:

> The situation at FCI Elkton in particular is alarming. The first cases of COVID-19 appeared there *after* the government assured the Court that the BOP was taking aggressive action to contain the disease. Elkton is filled to capacity and appears to have few tests. Mr. Rodriguez represents that inmates at Elkton do not have adequate soap or disinfectant, are still housed together in large groups, and share a thermometer without sanitization, against critical public health recommendations. … These representations are consistent with reports of conditions in federal prisons, including at Elkton. At Elkton, prisoners themselves are responsible for cleaning and sanitation.

*Rodriguez*, 2020 U.S. Dist. LEXIS 58718, at *24-25.

10. Of paramount concern, some of the deaths have an uncanny similarity to the facts of Mr. Guzman's case. On April 13th, 2020, 43-year-old Alvin Turner died due to COVID-19. Like Mr. Guzman, he was an inmate at FCI Elkton. Like Mr. Guzman, he had pre-existing conditions that put him at risk. And like Mr. Guzman, Turner was convicted of conspiracy with intent to possess and distribute cocaine, and Turner was supposed to be serving a sentence of 180 months, similar to Mr. Guzman's 150. Instead, this pandemic transformed a non-violent drug crime conviction into a death sentence for Turner. This Court should not risk this very possible outcome for Mr. Guzman.

11. Mr. Guzman is no doubt entitled to relief under 18 U.S.C. § 3582(c)(1)(A). Under that statute, a court may reduce an inmate's sentence if the court finds that: (1) "extraordinary and compelling reasons" warrant a reduction; (2) the reduction would be "consistent with any

applicable policy statements issued by the Sentencing Commission;" and, (3) the applicable sentencing factors under §3553(a) warrant a reduction. Specifically, and as amended by the First Step Act, 18 U.S.C. § 3582(c)(1)(A) authorizes courts to modify terms of imprisonment as follows:

> The court may not modify a term of imprisonment once it has been imposed except that—in any case—the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that-- (i) extraordinary and compelling reasons warrant such a reduction . . . and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission.

12. Due to the COVID-19 pandemic, the dire conditions at FCI Elkton, and Mr. Guzman's age and vulnerable health conditions, the Court should find that "extraordinary and compelling reasons warrant such a reduction … and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." Mr. Guzman satisfies the criteria for release according to U.S.S.G. § 1B1.13, commentary notes 1, (A)(ii)(I), (A)(ii)(III), and 1B: He is currently 66 years old (and about to be 67 on next month on May 23, 2020), and he suffers from high blood pressure and high cholesterol. He began his term of imprisonment on October 5, 2015 after being in pre-trial detention from July 2013 through October 2015, and his projected release date is March 11, 2024, without including any time in a halfway house or home confinement, which could be up to one year, and would certainly be more than a few months.

13. Section 3582(c)(1)(A) arguably includes an exhaustion provision that may delay judicial relief until a BOP warden has ruled on a request for release, or has not made a decision on such a request within 30 days. However, as many courts have held, the requirement of completing the administrative process may be waived "if one of the recognized exceptions to exhaustion

applies." *United States v. Perez*, No. 17 Cr. 513-3, 2020 WL 1546422, at *2 (S.D.N.Y. Apr. 1, 2020); see *United States v. Colvin*, No. 19 CR 179, 2020 WL 1613943, at *2 (D. Conn. Apr. 2, 2020) ("[I]n light of the urgency of [d]efendant's request, the likelihood that she cannot exhaust her administrative appeals during her remaining eleven days of imprisonment, and the potential for serious health consequences, the [c]ourt waives the exhaustion requirement of Section 3582(c)(1)(A)."); *United States v. Powell*, 94 Cr. 316, ECF No. 98 (D.D.C. Mar. 28, 2020) (waiving exhaustion under § 3582(c)(1)(A) where the [c]ourt found that "requiring defendant to first seek relief through the [BOP] administrative process would be futile"). Thus, "[e]ven where exhaustion is seemingly mandated by statute . . . , the requirement is not absolute." *Washington v. Barr*, 925 F.3d 109, 118 (2d Cir. 2019) (citing *McCarthy v. Madigan*, 503 U.S. 140, 146–47 (1992)). Recently, Judge Rakoff in the Southern District of New York found that the exhaustion provision in §3582 was not jurisdictional and was waivable. *See United States v. Haney*, Case No. 19-cr-541, Dkt. #27 (Apr. 13, 2020, S.D.N.Y.).

14. To the extent that the Court has concerns over exhaustion, counsel would encourage it to adopt the analyses and conclusions of the many courts that have found exhaustion to not be an impediment to relief. *See Haney, supra, United States v. Zukerman*, No. 1:16-cr-194-AT, Dkt. No. 116 (Apr. 3, 2020) (waiving exhaustion and granting immediate compassionate release in light of COVID-19 to defendant convicted in multi-million-dollar fraud scheme motivated by greed; "The severity of Zukerman's conduct remains unchanged. What has changed, however, is the environment where Zukerman is serving his sentence. When the Court sentenced Zukerman, the Court did not intend for that sentence to 'include a great and unforeseen risk of severe illness or death' brought on by a global pandemic"); *United States v. Jepsen*, 2020 WL 1640232 (D. Conn.

Apr. 1, 2020) (waiving exhaustion and granting compassionate release to immunocompromised defendant).

15. Additionally, counsel submit that exhaustion under Mr. Guzman's circumstances would be futile. He was apparently selected for release after Attorney General Barr's April 3, 2020, directive that the BOP release high-risk elderly inmates from three facilities including FCI Elkton. He was then returned to general population, evidencing a denial of relief. It would be pointless for counsel to go through the motions of confirming what is already obvious—despite the fact that Mr. Guzman meets the criteria for release, which includes a non-violent offense, his age, medical risks, and low PATTERN score, FCI Elkton has instead sent him back to general population. This is all the more confounding in that, using publicly available information, counsel estimate that Mr. Guzman's PATTERN[6] score is a negative six (-6). This places him well within the scope of Attorney General Barr's suggestion to the FCI Elkton warden to prioritize inmates with a minimum score.

16. A reduction in Mr. Guzman's sentence is also consistent with the sentencing factors set forth in §3553(a). Taking into account Mr. Guzman's age, medical conditions, and health risks, requiring him to literally fend for his life at FCI Elkton for years simply cannot be seen as "sufficient but not greater than necessary." Rather than restating prior arguments, counsel would respectfully incorporate the §3553(a) arguments set forth in Mr. Guzman's Sentencing Memorandum. (Dkt. #245, pp. 6-14, in particular).

17. Mr. Guzman's supportive family have informed counsel that, should he be released, Mr. Guzman can return to his permanent residence where his wife still lives. His youngest

---

[6] See: https://apps.urban.org/features/risk-assessment/

daughter also lives at the residence. Mr. Guzman would be able to shelter-in-place and comply with all court orders, including conditions of home detention or incarceration. Indeed, in the residence, Mr. Guzman would have his own room separate from other family members for any quarantine period.

18.     Counsel would reserve the right to supplement this pleading in the event the court has any concerns about the facts as they have been represented.

WHEREFORE, for the foregoing reasons, as well as those set forth in his Sentencing Memorandum, Mr. Guzman respectfully requests that this Court issue an order granting him compassionate release pursuant to the provisions of 18 U.S.C. §3582, and either reduce his sentence to time-served, to transfer his sentence to home-confinement, or to impose other sentencing relief—provided that it allows his release from the BOP and FCI Elkton specifically, where his age and health conditions make him particularly vulnerable to COVID-19 and greatly increases his chances of death if he is infected.

                                                  Respectfully submitted,

                                                  /s/ Thomas A. Durkin
                                                  **THOMAS A. DURKIN**

                                                /s/ Joshua G. Herman
                                                **JOSHUA G. HERMAN**

**DURKIN & ROBERTS**
515 W. Arlington Pl.
Chicago, IL 60614
Tel: (312) 981-0123
tdurkin@durkinroberts.com

**LAW OFFICE OF JOSHUA G. HERMAN**
53 W. Jackson Blvd., Suite 457
Chicago, IL 60604
Tel: (312) 909-0434
jherman@joshhermanlaw.com

# CERTIFICATE OF SERVICE

    Thomas A. Durkin, Attorney at Law, hereby certifies that the Emergency Motion for Compassionate Release was served on April 16, 2020, in accordance with Fed.R.Crim.P. 49, Fed.R.Civ.P.5., LR 5.5, and the General Order on Electronic Case Filing (ECF) pursuant to the district court's system as to ECF filers.

                                              /s/ Thomas A. Durkin
                                              **THOMAS A. DURKIN**

**DURKIN & ROBERTS**
515 W. Arlington Pl.
Chicago, IL 60614
Tel: (312) 981-0123
tdurkin@durkinroberts.com