# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT, EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| -v- | ) | No. 16 CR 646-1 |
| | ) | Honorable Virginia M. Kendall |
| LYLE ANASTOS, | ) | |
| | ) | |
| Defendant. | ) | |

## LYLE ANASTOS' EMERGENCY MOTION FOR IMMEDIATE RELEASE FROM ELKTON FEDERAL CORRECTIONAL INSTITUTION TO HOME CONFINEMENT

LYLE ANASTOS, by his attorneys, MONICO & SPEVACK, moves this Court to grant his motion for compassionate release under 18 U.S.C. 3582 (c)(1)(A), and order that the remainder of his sentence be served on home confinement, followed by a period of two years supervised with the same conditions imposed by the Court at sentencing. IN SUPPORT of this motion, Mr. Anastos states as follows:

### I. Introduction

Lyle Anastos has a documented history of serious cardiovascular disease and is currently incarcerated at Elkton Federal Correctional Institution (Elkton), a low-security facility, which currently holds 2,040 inmates. Elkton has been singled out as one of three federal correctional institutions crippled by the rampant spread of coronavirus. Katie Benner, *Barr Expands Release of Inmates at Prisons Seeing More Coronavirus Cases*, *New York Times,* April 3, 2020,

https://www.google.com/amp/s/www.nytimes.com/2020/04/03/us/politics/barr-

coronavirus-prisons-release.amp.html. The situation is so grave that on April 3, 2020, Attorney General William Barr prioritized the release of federal prisoners from Elkton, and commanded the Bureau of Prisons (BOP) to expand eligibility for early release of prisoners housed there. Just days later, the ACLU of Ohio filed a class action habeas petition against Elkton on behalf of medically vulnerable inmates seeking their immediate release and/or transfer to home confinement. *Wilson v. Nieves*, 4:20:cv-00794 (N.D. Ohio, April 13, 2020).

Lyle is not only housed at one of the coronavirus hot spots, but he suffers from cardiovascular disease, "which is the most common and deadliest so far of the underlying conditions that make some people more vulnerable to the ravages of COVID-19." Betsy McKay, *Heart Conditions Prove Especially Dangerous For COVID-19 Patients,* The Wall Street Journal, April 12, 2020, 5:30 a.m. ET *See* https://google.com/amp/s/www/wsj.com/amp/articles/heart-conditions-prove-especially-dangerous-for-covid-19-patients -11586683801. In February 2019, while on bond, Lyle suffered a heart attack and spent four days in the hospital having a stent installed. He currently takes multiple medications for his heart condition and is supposed to be monitored by EKG and stress tests. PSR at ¶68 and Ex. A, Letter from Dr. Constantine Peters (Lyle "is highly susceptible to this virus due to his underlying medical conditions. At his young age, he has already been diagnosed with coronary artery disease, heart disease and cardiomyopathy."). Unfortunately, because of a lock down and staff shortages, Elkton does not monitor Lyle or consistently provide him his

medication, making his situation even more dire. Given the above, if, and not when, Lyle contracts the coronavirus, he will likely become seriously ill or even die.

## II. Given the Extraordinary Circumstances and Defendant's Health Defendant Requests the Court Order the Remainder Of His Sentence to be Served in Home Confinement

### A.

On February 14, 2019, Lyle pled guilty to the Use of Interstate Commerce facilities in the Commission of a Murder-For-Hire. On May 23, 2019, the Court sentenced Lyle to a below guidelines sentence of 60 months in prison. On August 29, 2019, Lyle reported to Elkton, where he has been confined for more than seven months. Not surprisingly, Lyle, a first -time offender with no criminal history who had never been to jail before, has had no disciplinary incidents while confined. To the contrary, until the COVID-19 crisis crippled Elkton and effectively shut everything down, Lyle worked hard, stayed out of trouble, and availed himself of all BOP opportunities and classes to ensure positive release into society.

Similarly, and consistent with his post-incarceration history, prior to his voluntary surrender Lyle had spent over 30 months on home incarceration and location monitoring, during which time he had no issues, remained employed, took care of his two young children, and actively participated in mental health therapy. This Court allowed Lyle to remain on bond pending sentencing despite the serious nature of the offense, due in part to Lyle's heart condition and because a victim of the offense testified in favor of Lyle's release at his bond hearing. (PSR ¶4).

3

Since then, COVID-19 has caused a national emergency and public health crisis of epic proportions. While we are all hunkered down at home social distancing and practicing sanitation measures designed to keep ourselves healthy and slow down the rampant spread of the deadly virus, the inmate population and prison staff are being pummeled by it. Cramped and overcrowded, the complete inability to social distance and even practice basic hygiene (washing hands, showering, using hand sanitizer), makes prisons "tinderboxes" for infectious disease. *United States v. Rodriguez*, 2020 U.S. Dist. LEXIS 58718 (E.D. Pa. Apr. 1, 2020) (releasing a prisoner at Elkton on compassionate release grounds in light of COVID situation there).

The spread of coronavirus has been particularly vicious at Elkton. Given his heart disease, Lyle worries every day he might die in prison, something neither he nor anyone else could have conceivably contemplated at sentencing. In discussing the situation at Elkton with counsel, Lyle describes a scenario more akin to a horror movie than real life. Responsive actions taken at the facility amount to no more than restricting the inmates' movements but fail to provide needed medical care or preventive measures to inmates who, like Lyle, are especially medically vulnerable. Recently, Lyle advised counsel that the facility has failed to take temperature readings or perform daily wellness checks in the last several days and that the facility lacks the medical staff needed to supply needed medications. On the other hand, Elkton has been locked down for over a month, the National Guard posted in front of the facility as a "show of force," with the remaining prison guards left to walk the grounds with pepper spray and paint guns.

Most of the counselors have not been at the facility in a month so there is nobody to go to with an issue. Soap is doled out in little bits. The commissary is closed, so there is no hand sanitizer or disinfectant that the inmates can use to disinfect commonly used phones, computers, or television. Even worse, there is absolutely no ability to social distance (even from sick inmates). Inmates sleep in close quarters, bathe in communal showers, and eat in crowded dining halls. Despite all this, there are no face masks. The sound of coughing echoes throughout the crowded dorms at night, causing terror and anger in the inmates. Tensions are running high and Lyle grows more frightened each day he will get hurt or sick and never see his family again.

Lyle's "on the ground" observations and the precarious situation at Elkton are corroborated by news reports and the ACLU's habeas petition, *see Wilson v. Nieves*, 4:20:cv-00794 (N.D. Ohio, April 13, 2020), which describes Dickensian living conditions, exacerbated in light of the pandemic. They include inmates housed in 150-men dorms, each man sleeping in small cubes with 2-3 others, scarce soap and other cleaning supplies, showers and sinks shared by at least 100 inmates, and a shuttered commissary. Inmates are forced to stand in line close to each other when waiting for food and then eat side by side. There is no effective quarantine of sick inmates or of inmates exhibiting common coronavirus symptoms. The ACLU and its cadre of experts concluded the situation at Elkton has progressed to a point "where these is *no* set of protocols or practices … that Elkton can use that will prevent further disease and death inside the prison" and the only effective remedy for vulnerable prisoners is release. *Id*. at 3.

**B**.

With the changes made to the compassionate release statute by The First Step Act, the BOP Director no longer holds the only key to compassionate release. 18 U.S.C. § 3582(c)(1)(A)(i). Now, inmates may seek compassionate release or a sentencing modification from the sentencing court for "extraordinary and compelling reasons," after either exhausting administrative review of a BOP denial or after 30 days have passed since the inmate requested relief. *Id*. Lyle made a written request for compassionate release to the warden on April 1, 2020, but he has not yet heard anything in response and rumors abound that the prison is not reviewing any requests because of staff shortages and other pandemic issues.

Even though the 30-day period has not yet passed, given the risk of severe illness and death to Lyle and the futility of waiting, this Court should exercise its authority to review Lyle's motion and immediately release Lyle to home detention. We recognize that the courts are divided over whether a Court can waive the 30-day requirement for exhaustion. However, this determination often turns on whether statutory administrative exhaustion requirements are jurisdictional, and the Seventh Circuit has already held that they are not, suggesting an argument in favor of waiver. *United States v. Taylor*, 778 F.3d 667, 671 (7th Cir. 2015). *See also United States v. Haney*, 2020 U.S. Dist. LEXIS 63971 (S.D.N.Y. Apr. 13, 2020) (concluding that the exhaustion requirement in

section 3582 (c)(1)(A) is not jurisdictional). In any event, several courts have waived strict adherence to the 30-day requirement given the "extraordinary circumstances now faced by prisoners as a result of the COVID-19 virus and its capacity to spread in swift and deadly fashion." *Haney*, at *10. *See also United States v. Ben-Yhwh,* 2020 U.S. Dist. LEXIS 65677 (D. Haw. April 13, 2020), at *13 ; *United States v.* McCarthy, 2020 U.S. Dist. LEXIS 61759 (D. Conn. April 8, 2020), at *8 ; United *States v. Perez*, 2020 U.S. Dist. LEXIS 57265 (S.D.N.Y. April 1, 2020), at *7; *United States v. Zukerman*, 2020 U.S. Dist. LEXIS 59588 (S.D.N.Y. Apr. 3, 2020), at *6-7; *United States v. Colvin*, 2020 U.S. Dist. LEXIS 57962 (D. Conn. April 2, 2020), at *4-5; *United States v. Smith*, 2020 U.S. Dist. LEXIS 64371 (S.D.N.Y. Apr. 13, 2020), at *6.

Clearly, for Lyle, time is of the essence. He is housed at a coronavirus hot spot where there is no hope for remedial measures and he suffers from heart disease, one of the deadliest pre-existing conditions in terms of risk for death from contracting the virus. Four inmates at Elkton have already died from the virus and the situation darkens daily, with the most recent inmate death a 43-year old man who had only been at Elkton since June 21, 2019.

https://www.wkyc.com/article/news/health/coronavirus/4th-inmate-from-elkton-prison-dies-of-covid-19/95-3b176d62-45d1-447b-a030-264ae516daad.

We therefore urge the Court not to wait to consider Lyle's motion for compassionate release. *See Zukerman*, at *8 (waiving exhaustion of 30-day rule finding that "even a few weeks' delay carries the risk of catastrophic health consequences").

Extraordinary and compelling reasons warrant Lyle's immediate release from Elkton to a sentence of home confinement. For all of the reasons described above the BOP is not able to protect Lyle from the coronavirus and Lyle has no means to protect himself. Should he contract the virus his cardiovascular disease will likely cause him to become seriously ill or die.

We believe the Court sentenced Lyle to a below guidelines sentence that amounted to half of the suggested guideline range with the intention of giving Lyle a second chance. But with Lyle's serious and unmonitored cardiovascular disease, serving his remaining sentence at Elkton could very well be a *de facto* death sentence.

### C.

In addition to the extraordinary and compelling reasons discussed above, a sentence of home confinement is consistent with and supported by the factors in 18 U.S.C. 3553, whose consideration is mandated by 18 U.S.C. 3582(c)(1)(A) "to the extent they are applicable." Likewise, Lyle is not a danger to the safety of others or to the community. §1B1.13 of the Guidelines.

We addressed the sentencing factors at length at Lyle's sentencing and in his Sentencing Memorandum and demonstrated that Lyle was not a danger to the community or a recidivist in need of specific deterrence. DKT. No. 100. In summary, Lyle had no prior criminal history and had never acted violently or illegally before. *Id*. And, despite the serious nature of Lyle's offense, the Submission explained in detail how Lyle's conduct was "atypical and linked to unique circumstances and stressors that are no longer present in his life." *Id*. Also, attached to Lyle's Sentencing Submission

8

were over 20 character letters describing "Lyle as a non-violent, selfless, compassionate, hard-working, and generous man," whose conduct in this case was out of character for him. *Id*. at pp 12-27. Remarkably, both victims of Lyle's offense agreed, asking the Court for mercy and telling the probation officer the same. *Id*. at 32. A compelling fact that the Court relied upon in mitigation of Lyle's sentence, in addition his status as a first time offender, his history of "good works," and the unusual nature of the case. DKT. No. 113, Sent. Tr. at 17.

Additionally, Lyle is not a violent person or danger to the community. A forensic psychiatrist report attached to the Lyle's sentencing submission and reviewed by the Court, concluded this. DKT. No. 100, at 32. Like the individuals who wrote letters on Lyle's behalf, the forensic psychiatrist described Lyle as "a good husband, son, and father whose conduct in this case was out of character for him and that he would not have committed this crime under normal circumstances." *Id*. at 32-33. It is also worth noting that the Court has already determined that Lyle is not a danger to the safety of the community in allowing Lyle to remain (with conditions) even after he pleaded guilty and to self-surrender months after he had been sentenced. During the 30 months that Lyle was confined to his home he had no violations or issues. And, he has been a model prisoner at Elkton, no small feat given the incredibly nightmarish situation there over the last two months.

These 30 months and the seven months at Elkton, especially the last two months, already represent a serious sentence that adequately addresses the seriousness of Lyle's offense conduct. This is even more so given the unprecedented health situation in our

9

nation. Other courts have recently released prisoners convicted of serious offenses into home confinement during the COVID-19 crisis. *See, e.g.*, *United States v. Tran*, 2020 U.S. Dist. LEXIS 65414 (C.D. Cal. Apr. 10, 2020) (ordering compassionate release for defendant convicted, of among other serious charges, conspiracy to commit robbery and possession of a firearms ( a machine gun) with intent to commit a robbery, in light of BOP's inability to protect vulnerable inmates from COVID-19); *United States v. Sawicz*, 2020 U.S. Dist. LEXIS 64418 (E.D.N.Y. Apr. 10, 2020), at *7 (releasing child pornography offender based on "[t]he COVID-19 outbreak at FCI Danbury, combined with the fact that the defendant is at risk of suffering severe complications if he were to contract COVID-19 because of his hypertension"); *United States v. Hernandez*, No. 18-cr-20474, Dkt. No. 41 (S.D. Fla. Apr. 2, 2020) (granting motion for compassionate release to defendant charged with a series of robberies and shooting); *United States v. Perez*, 2020 U.S. Dist. LEXIS 57265 (S.D.N.Y. Apr. 1, 2020) (granting compassionate release to defendant who pleaded guilty to kidnapping and conspiracy where "[t]he benefits of keeping [Perez] in prison for the remainder of his sentence are minimal, and the potential consequences of doing so are extraordinarily grave"); *United States v. Rodriguez*, 2020 U.S. Dist. LEXIS 58718 (E.D. Pa. Apr. 1, 2020) (granting release to Elkton inmate convicted of drug distribution and unlawful firearm possession after finding risk factors for COVID-19 constitute extraordinary and compelling reason and noting that prisons are "tinderboxes for infectious disease"); and *United States v. Muniz*, 2020 U.S. Dist. LEXIS 59255 (S.D. Tex. Mar. 30, 2020) (releasing defendant serving 188-month sentence for drug conspiracy in light of vulnerability to COVID-19: "[W]hile the Court

is aware of the measures taken by the Federal Bureau of Prisons, news reports of the virus's spread in detention centers within the United States and beyond our borders in China and Iran demonstrate that individuals housed within our prison systems nonetheless remain particularly vulnerable to infection.").

Should Lyle receive compassionate release to home confinement he would live at his parents' home in Orland Park, Illinois, with his wife and two children, where he lived while on bond pending sentencing. PSR ¶52. Lyle has a stable and supportive home environment and he proved through his 30 months on bond and his lack of trouble during incarceration that he is not a danger to the community and that he is fully rehabilitated. If Lyle's home detention is followed by the same period of two years supervised release and conditions imposed at sentencing, Lyle would participate in mental health and alcohol treatment, neither of which is available in a locked down prison system. At sentencing, the Court recommended to the BOP that Lyle participate in a residential drug and alcohol treatment program (RDAP). Prior to the pandemic, Lyle advised counsel that the BOP told him he had a spot in an RDAP program. Successful completion of the program would likely have reduced Lyle's sentence by at least 12 months. But RDAP is no longer an option during the BOP lockdown. Finally, if Lyle is released to home confinement, Lyle will not pose a health risk to the community as he will be able to self-quarantine for 14-days upon release.

### III. Conclusion and Request for Relief

For the above reasons, the Court should grant Lyle's motion for Compassionate Release and enter an order immediately releasing him from Elkton so that he can safely

serve the remainder of his sentence in home confinement, including a two year period of supervised release imposed at sentencing.

Lyle Anastos

By:   /s/ Jacqueline S. Jacobson
      One of his attorneys

Barry A. Spevack
Jacqueline S. Jacobson
Ryan Mitsos
Monico & Spevack
20 South Clark Street, Suite 700
Chicago, Illinois 60603
312- 782-8500