**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 18 CR 153** |
| **v.** | ) | |
| | ) | **Hon. Rebecca R. Pallmeyer** |
| **CHRISTOPHER HILL,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**DEFENDANT'S MOTION FOR COMPASSIONATE RELEASE**
**AND REQUEST FOR JUDICIAL RECOMMENDATION FOR TRANSFER**
**TO HOME CONFINEMENT**

Now comes the defendant, Christopher Hill, by and through his undersigned attorney, and respectfully moves this Honorable Court, pursuant to 18 U.S.C. § 3582(c)(1)(A)(i) and the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"), Pub. L. No. 116-136, 134 Stat. 281 (March 27, 2020), the Second Chance Act of 2007, and 18 U.S.C. § 3621, for compassionate release, and further recommend to the Bureau of Prisons ("BOP") he be placed in home confinement for the maximum period permissible.. In support, the following is offered:

## INTRODUCTION

November 26, 2018, following a guilty plea, Mr. Hill was sentenced to 60 months of imprisonment for the violation of 18 U.S.C. § 841, followed by 4 years of mandatory supervised release. While Mr. Hill's advisory guideline range was 46 to 57 months' imprisonment, the statutory mandatory minimum 60-month sentence applied to Mr. Hill. He is currently Milan FCI with a projected release date of April

8, 2022, subject to any additional good time credit or credit for participation the in Residential Drug Abuse Program ("RDAP").

Mr. Hill's crime of conviction is not one of violence. The sentence in this matter was driven by a mandatory minimum time of imprisonment provided by the statute under which the government decided to charge Mr. Hill based on the weight of the controlled substances involved. The advisory guidelines were also driven by the weight of the controlled substances and were nevertheless below the statutory mandatory minimum. Mr. Hill, however, was not alleged to have procured the controlled substances, he did not purchase the controlled substances, and he did not intend to distribute controlled substances. In essence, the allegations against Mr. Hill are that he introduced two individuals who wanted to conduct controlled substances transactions with one another; he was a broker. For this, Mr. Hill would receive what would best be described as a referral fee, a small based percentage of the total amount of money changing hands. That is it.

In light of the ongoing Covid-19 pandemic, and his underlying medical conditions that render him particularly likely to suffer complication if he contracts the virus, Mr. Hill respectfully brings this more for compassionate release. As amended by the First Step Act, the compassionate release statute allows courts to reduce sentences for "extraordinary and compelling" reasons. Mr. Hill's serious underlying health concerns, combined with the growing coronavirus pandemic, provide an extraordinary and compelling basis for sentence reduction. While Mr.

Hill is only 43 years old, has diagnosed and treated for hypertension[1] since 2005 (PSR ¶84), one of the underlying medical conditions identified by the CDC as a precursor for complications arising out of COVID-19. As of the filing of this motion, at least four inmates and four staff members have been diagnosed with COVID-19 within Milan FCI. *See* https://www.bop.gov/coronavirus/ (last access June 1, 2020).

It is only a matter of time before the virus further infiltrate the facility and puts vulnerable inmates, such as Mr. Hill at risk of severe and cruel complications. Mr. Hill has a demonstrable and verifiable re-entry plan where he would be able to self-quarantine: he would where he lived during pretrial release, a single-family home located at 8407 South Paulina Street, Chicago, Illinois.

At the time of sentencing, this Court had reservation about Mr. Hill deserving a 60-month term of imprisonment based on the 18 U.S.C. § 3553(a) factors, as applied to him. In imposing its sentencing, this Court commented:

> I'm not one often to comment on the guidelines or statutes. I feel that's not really my business as a district judge. I am very much of the view that the judiciary should carry out its responsibility and let the other branches carry out theirs. This is one of the rare cases in which I will tell you that if it were in my power, I would not impose a 60-month sentence on this man.
>
> I do think he has already turned his life around in a significant way. The fact that he has been employed for as long as he has steadily, that his own employer speaks so highly of him, that he has got somebody who loves him and is standing by him and will be here for him, and that he has got a supportive family that recognizes the contributions he has made, all of those factors would ordinarily move me to impose a much less severe sentence. I don't have that choice in this case, but I am doing what I can to make it as short as possible.

[1] Mr. Hill has been attempting to obtain his BOP medical records but has no far been unable to do so. If this Court requires, the undersigned supplement this filing upon receipt of the medical records.

*See Transcript of Proceedings*, November 26, 2018 ("Tr."), pgs. 13-14.

Granting this motion is this Court's chance to do just that.

### I.   THIS COURT HAS AUTHORITY TO CONSIDER HILL'S MOTION

Although the compassionate release statute previously permitted sentence reductions only upon motion of the Director of the Bureau of Prisons (BOP), Congress expanded the statute in the First Step Act of 2018. Pub. L. No. 115-391, § 603(b), 132 Stat. 5194, 5239 (Dec. 21, 2018). As amended, § 3582(c)(1)(A)(i), now permits courts to consider motions filed by the defendant if "the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf," or after "the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier[.]"

The reason for the expansion to include defense-filed motions was the "documented infrequency with which the BOP filed motions for a sentence reduction on behalf of defendants." *United States v. Redd*, No. 1:97-CR-00006-AJT, 2020 WL 1248493, at *7 (E.D. Va. Mar. 16, 2020). Accordingly, "while the First Step Act did preserve the BOP's role relative to a sentence reduction in certain limited respects, it eliminated the BOP Director's role as the exclusive channel through which a sentence reduction could be considered by courts." *Id.* (emphasis in original).

Mr. Hill  has already made requests for compassionate release within the Bureau of Prisons.  On May 18, 2020, the BOP denied his request for a reduction of sentence. *See Attached Exhibit.*  He has begun the administrative appeal process, but as this Court knows, such will be futile.  The undersigned has yet to identify any case since

the outbreak of the COVID-19 pandemic wherein a BOP warden's denial was overturned through the appeal process. Such simply does not and will not happen.

It is a futile exercise prescribed by § 3582(c)(1)(A)(i) were promulgated long-before there was a pandemic. During this strange and uncertain time, time is of the essence. Requiring Mr. Hill to go through the futile administrative appellate process could have long-term, life altering consequences. Mr. Hill should not have to exhaust any further administrative remedies not only because they will be futile, but because there could be catastrophic health consequences should be required to remain in custody.

## II. THIS COURT SHOULD WAIVE ANY FURTHER EXHAUSTION REQUIREMENT

Section 3582(c)(1)(A)(i) does not require a Court to wait to consider compassionate release request if there is a credible claim of serious and imminent hard from this pandemic. At least one Judge within this Circuit (Honorable Sue E Myerscough, U.S. District Court Judge, Central District of Illinois) has found legal footing to waived this requirement on a number of cases. *See, e.g., United States v. Lacy*, 15-CR-30038 (Docket No. 36); *United States v. Pinkerton*, 15-CR-30045 (Docket No. 234). Both of the aforementioned defendants, as Mr. Hill, violated 18 U.S.C. 841 and had projected release dates years in advance of their ordered release. While Mr. Hill is mindful that such waiver is considered on a case-by-case basis, he is one of the individuals that fits the criteria for waiver. In an effort for brevity, Mr. Hill hereby adopts and incorporates the legal findings made by the Honorable Judge Myerscough in *Lacy* and *Pinkerton*, at the very least, in regard to waiver. *See Lacy*, 15-CR-30038

(Docket No. 36, pgs. 9-15); *see also Pinkerton*, 15-CR-30045 (Docket No. 234, pgs. 8-13).

To that end, several other district courts have recognized in recent weeks, waiver of any exhaustion of administrative remedies requirement is justified, given the extraordinary threat posed by the quickly spreading COVID-19 pandemic, particularly as to those prisoners in a high-risk group who are confined in a detention facility. *United States v. McCarthy*, No. 3:17-CR-0230 (JCH), 2020 WL 1698732, at *4 (D. Conn. Apr. 8, 2020) (excusing exhaustion requirement because "[e]ven a few weeks' delay carries the risk of catastrophic health consequences" for prisoner in high risk group); *United States v. Zukerman*, No. 16 CR. 194 (AT), 2020 WL 1659880, at *4 (S.D.N.Y. Apr. 3, 2020) (waiving exhaustion requirement, given defendant's advanced age, health conditions putting him in a high risk group for complications and death resulting from COVID-19, and fact that he was in a detention facility where prisoners live in crowded conditions); *United States v. Perez*, No. 17 Cr. 513-3, 2020 WL 1546422, at *2 (S.D.N.Y. Apr. 1, 2020) (waiving § 3582(c)(1)(A)'s exhaustion requirement where delay carried the risk of the vulnerable defendant contracting COVID-19); *United States v. Colvin*, No. 19 Cr. 179, 2020 WL 1613943, at *2 (D. Conn. Apr. 2, 2020) ("[I]n light of the urgency of [d]efendant's request, the likelihood that she cannot exhaust her administrative appeals during her remaining eleven days of imprisonment, and the potential for serious health consequences, the [c]ourt waives the exhaustion requirement of Section 3582(c)(1)(A)."); *United States v. Powell*, 94 Cr. 316, ECF No. 98 (D.D.C. Mar. 28, 2020) (waiving exhaustion under § 3582(c)(1)(A)

where the [c]ourt found that "requiring defendant to first seek relief through the [BOP] administrative process would be futile"); *see also Matter of Extradition of Toledo Manrique,* No. 19-MJ-71055, 2020 WL 1307109, at *1 (N.D. Cal. Mar. 19, 2020) (refusing to delay consideration of release to await evidence of an outbreak in the jail because that "may be too late").

The procedural requirements of § 3582(c)(1)(A) are not jurisdictional. In a series of recent cases, the Supreme Court has emphasized that "when Congress does not rank a statutory limitation on coverage as jurisdictional, courts should treat the restriction as nonjurisdictional in character." *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 516 (2006). In *United States v. Taylor*, the Seventh Circuit applied this line of cases to conclude that the procedural requirements contained in § 3582(c)(2) are not jurisdictional. 778 F.3d 667, 670–71 (7th Cir. 2015). While the *Taylor* court did not address the provisions of § 3582(c)(1)(A), the logic of the decision applies equally to both provisions. Just like Section (c)(2), Section (c)(1)(A) is not located in the jurisdictional section of the U.S. Code, nor is it phrased in jurisdictional terms. *Id.* Because of that, there is no basis for treating either provision as a jurisdictional requirement.

As a non-jurisdictional claims-processing rule, § 3582(c)(1)(A) is undoubtedly subject to certain equitable exceptions, including waiver, forfeiture, and estoppel.[2] In

---

[2] *See, e.g., Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 393 (1982) (Nonjurisdictional rules are "subject to waiver, estoppel, and equitable tolling."); *Delgado v. Merit Sys. Prot. Bd.,* 880 F.3d 913, 925 (7th Cir. 2018), as amended on denial of reh'g and reh'g *en banc* (June 19, 2018) (In Title VII context "exhaustion is not a jurisdictional requirement and may thus be waived or subject to estoppel and equitable tolling."); *Miller v. F.D.I.C.*, 738 F.3d 836, 843–44 (7th Cir. 2013) ("Whether a limitations

its analysis, this Court must determine whether Congress intended for § 3582(c)(1)(A) to prevent defendants from asserting other equitable exceptions, such as futility. The Supreme Court has expressly declined to rule, in any generalized way, on the question of when equitable exceptions are applicable to statutory claims-processing rules. *Hamer v. Neighborhood Hous. Servs. of Chicago*, 138 S. Ct. 13, 18 n.3 (2017) ("We have reserved whether mandatory claim-processing rules may be subject to equitable exceptions.").

The Supreme Court has consistently addressed the issue on the basis of the specific statutory scheme at issue—declaring that the question of congressional intent is of "paramount importance." *McCarthy v. Madigan*, 503 U.S. 140, 144 (1992). In cases where the statutory scheme reveals that "Congress wanted more oversight by the courts," the Supreme Court has held that "exhaustion of those [administrative] steps may not only be waived by the agency, but also excused by the courts." *Smith v. Berryhill*, 139 S. Ct. 1765, 1776 (2019). Admittedly, in *Ross v. Blake*, the Supreme Court held that equitable exceptions were not applicable to the exhaustion requirement in the Prison Reform Litigation Act. 136 S. Ct. 1850 (2016). That ruling, however, was based on the specific text and history of the PLRA. *Id.* at 1856 (discussing text); 1857 (discussing history).

Section 3582(c)(1)(A) is not the PLRA and it is not a generic statutory exhaustion provision. Both the text and the structure of § 3582(c)(1)(A) demonstrate that Congress did not intend to preclude defendants from availing themselves of

period has the status of a jurisdictional prerequisite or a claim processing rule determines whether it is subject to waiver, estoppel, or equitable tolling doctrines.").

traditional equitable exceptions, such as futility. It is telling that the current language of Section 3582(c)(1)(A) was passed as part of the First Step Act, under the heading "Increasing the Use and Transparency of Compassionate Release." Pub. L. No. 115-391, 132 Stat. 5339 (2018).

The structure of the provision further supports the conclusion that Congress did not intend to unduly restrict defendants' ability to access the courts. As Judge Rakoff recently noted, § 3582(c)(1)(A) imposes not an exhaustion rule, but an option: the statute "requires the defendant to either exhaust administrative remedies or simply to wait 30 days." *United States v. Haney*, __ F. Supp. 3d __, 2020 WL 1821988, at *3 (S.D.N.Y. 2020) (emphasis in original). "That the statute gives the defendant this choice is crucial to understanding Congress's intent." *Id*. Allowing defendants a choice, rather than allowing the BOP to continue to serve as the gatekeeper of compassionate release, shows that "Congress was determined not to let such exigencies [that is, delays in the BOP review process] interfere with the right of a defendant to be heard in court on his motion for compassionate release, and hence only limited him to 30 days before he could come to court in the ordinary course." *Id*. It goes without saying that this is not the ordinary course. It is, instead, an unprecedented pandemic and a national emergency. And the BOP's response has been inept at best, putting lives—including Mr. Hill's—at risk. Under these circumstances, a statutory provision that was intended to increase defendants' access to the court and to remove arbitrary restrictions, cannot be read as a clear sign that Congress intended to prohibit the use of traditional equitable exceptions.

9

Concluding that Congressional intent did not foreclose the application of these equitable exceptions would be well in line with Seventh Circuit precedent. In a wide variety of contexts, the Seventh Circuit has held that the futility exception applies to statutory exhaustion requirements. *See, e.g., Victoria-Faustino v. Sessions*, 865 F.3d 869, 873 n.1 (7th Cir. 2017), as amended (Oct. 10, 2017) (noting that the statutory exhaustion requirement in 8 U.S.C. § 1252(d) "is subject to waiver, forfeiture, and other discretionary considerations."); *quoting Arobelidze v. Holder*, 653 F.3d 513, 517 (7th Cir. 2011) (emphasis added in *Victoria-Faustino*); *Citadel Sec., LLC v. Chicago Bd. Options Exch., Inc.*, 808 F.3d 694, 700 (7th Cir. 2015) (internal citations omitted) ("Generally, a district court is unable to waive a statutorily-mandated exhaustion requirement. However, a court may waive the exhaustion requirement where exhaustion is futile."); *Iddir v. I.N.S.*, 301 F.3d 492, 498 (7th Cir. 2002) (recognizing multiple exceptions to exhaustion including futility).

In this case, it would be futile to require Mr. Hill to pursue an administrative remedy. Administrative exhaustion would be futile in Mr. Hill's case because it would be "inadequate to prevent irreparable harm." *Citadel Sec., LLC* 808 F.3d at 700. He has already been denied release and reduction of sentence. Thre is nothing to suggest, based on other similar cases, that the appellate process will provide any sort of remedy to this. To continue on this path of administrative remedies would be a waste of time. The Bureau of Prison's regulations set out a time consuming, multi-stage process for the consideration of compassionate relief request. 28 C.F.R. § 571.63.

Mr. Hill is at high risk of contracting the deadly illness based on the realities of BOP facilities, causing irreparable harm and rending his further requests futile. As already stated, Milan FCI has at least 8 cases of COVID0-19. If other facilities are any example, this will continue to exponentially spread outing lives, including Mr. Hill's in extreme danger. Waiver of any administrative exhaustion requirement is justified here because of Mr. Hill vulnerable medical condition and the alarming speed at which COVID-19 spreads.

### III. HILL'S VULNERABILITY TO COVID-19 IS AN EXTRAORDINARY AND COMPELLING REASON FOR COMPASSIONATE RELEASE

The compassionate release statute does not expressly define or limit what constitutes an "extraordinary and compelling" reason for a sentence reduction. Black's Law Dictionary, however, defines "extraordinary" as "[b]eyond what is usual, customary, regular, or common," BLACK'S LAW DICTIONARY (11th ed. 2019). Its definition of "compelling need," is one "so great that irreparable harm or injustice would result if [the relief] is not [granted]." *Id*. The present global pandemic is a quintessential extraordinary circumstance beyond what most Americans have experienced in their lifetimes.

Mr. Hill's hypertension make him among the "high-risk" individuals susceptible to Covid-19 complications. Thus, the combination of circumstances provides a compelling reason for Mr. Hill's reduction in sentence.

Although Milan FCI has only 8 positive case of the virus, so far, that does not mean more positive cases do not exist. As another court in this district recently explained prior to the first positive case was discovered,

11

As the government notes in its response, at the time when the Court is preparing this order, there have been no confirmed cases of coronavirus disease at FCI Terre Haute….But that is not the same as saying that the institution is coronavirus-free or that there is no risk to [the defendant]. As the Court has learned all too well from dealing (as emergency judge) with release requests from the Chicago Metropolitan Correctional Center and assiduously following the statistics there over the past five weeks, all that one can say with any reasonable certainty is that a correctional institution is free of confirmed-positive inmates and staff until it isn't. There is no institution-wide or even widespread testing taking place within BOP institutions. This, together with the now-well-known fact that a person may carry and transmit coronavirus without being symptomatic (and thus without any reason to even be considered for testing), and the fact that correctional institutions have a constant influx of personnel who come from and return to the community large and thus may contract coronavirus without being detected by BOP, basically eliminate any guarantee, or anything close to a guarantee, that [the defendant] has not been and will not be exposed while at FCI Terre Haute. The risk to him, quite simply, cannot be discounted based on the current statistics or the thorough measures that the BOP has appropriately imposed to stem the spread of the virus. On the latter point, it is worth noting that these are the same system-wide measures BOP adopted at the Chicago MCC, which per the BOP website now has 26 confirmed cases among detainees and staff as of the afternoon of April 19.

*See United States v. Manning*, 15-CR-5007, Dkt. #90 (April 20, 2020); *see also, United States v. Beich*, 15-CR-282, Dkt. #96 (May 1, 2020) (granting compassionate release to inmate at FCI Terre Haute despite no known cases of COVID-19 at facility).. As of May 26, 2020, the MCC has had 139 infected inmate and 30 staff.

### i. THE COURT HAS AUTHORITY TO FIND EXTRAORDINARY AND COMPELLING REASONS OTHER THAN THOSE EXPRESSLY IDENTIFIED IN COMMENTARY TO U.S.S.G. § 1B1.13.

In 28 U.S.C. § 994(t), Congress delegated to the Sentencing Commission authority to "describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples." The policy statement issued in exercise of that authority, U.S.S.G.

§ 1B1.13, provides examples of "extraordinary and compelling reasons" only in the application notes. The examples generally fall into four categories based on a defendant's (1) terminal illness, (2) debilitating physical or mental health condition, (3) advanced age and deteriorating health combined with the amount of time served, or (4) compelling family circumstances. U.S.S.G. § 1B1.13 comment. n.1(A)-(C). The commentary also includes a fifth catch-all provision for "extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)" as determined by the Director of the Bureau of Prisons. U.S.S.G. § 1B1.13, comment. n.1(D).

However, the policy statement was last amended in November 2018, before the First Step Act was passed, and it still requires a motion filed by the BOP. For that reason, "a growing number of district courts have concluded the Commission lacks" a policy statement applicable to the post-First Step Act statute. *United States v. Mondaca*, No. 89-CR-0655 DMS, 2020 WL 1029024 (S.D. Cal. Mar. 3, 2020) (internal quotation marks omitted); *see also United States v. Brown*, 411 F. Supp. 3d 446, 449-50 (S.D. Iowa 2019) (citing cases). In *United States v. Cantu*, the Court explained:

> Given the changes to the statute, the policy-statement provision that was previously applicable to 18 U.S.C. § 3582(c)(1)(A) no longer fits with the statute and thus does not comply with the congressional mandate that the policy statement must provide guidance on the appropriate use of sentence-modification provisions under § 3582.

*United States v. Cantu*, No. 1:05-CR-458-1, 2019 WL 2498923, at *4 (S.D. Tex. June 17, 2019) (emphasis in original). Similarly, in *Redd*, the court noted that § 1B1.13 "by its terms applies only to motions for compassionate release filed by the BOP Director,

not motions filed by defendants." *Id.*, 2020 WL 1248493, at *6. Therefore, the court concluded, "there does not currently exist, for the purposes of satisfying the First Step Act's 'consistency' requirement, an 'applicable policy statement.'" *Id.*

Even where courts have not deemed § 1B1.13 entirely inapplicable due to the lack of amendment, they have held that judges have authority based on the catch-all provision in Application Note 1(D) to find extraordinary and compelling reasons other than those listed. *See, e.g.*, *United States v. Fox*, No. 2:14-cr-03-DBH, 2019 WL 3046086, *3 (D. Me. July 11, 2019) (stating that the existing policy statement provides "helpful guidance," but "is not ultimately conclusive given the statutory change"). In *Redd*, the court explained that "Application Note 1(D)'s prefatory language, which requires a determination by the BOP Director, is, in substance, part and parcel of the eliminated requirement that relief must be sought by the BOP Director in the first instance." *Redd*, 2020 WL 1248493, at *7 (citing cases); *see also United States v. Perez*, No. 88-10094-1-JTM, 2020 WL 1180719, at *2 (D. Kan. Mar. 11, 2020) ("[A] majority of federal district courts have found that the most natural reading of the amended § 3582(c) and § 994(t) is that the district court assumes the same discretion as the BOP director when it considers a compassionate release motion properly before it." (internal quotation marks omitted)).

The government conceded this point in *United States v. Young*, agreeing that "the dependence on the BOP to determine the existence of an extraordinary and compelling reason, like the requirement for a motion by the BOP Director, is a relic of the prior procedure that is inconsistent with the amendments implemented by the

14

First Step Act." *United States v. Young*, No. 2:00-CR-00002-1, 2020 WL 1047815, at *6 (M.D. Tenn. Mar. 4, 2020). The court in *Young* followed the majority of district courts in recognizing that § 1B1.13's defined categories are not exclusive: "In short, federal judges are no longer constrained by the BOP Director's determination of what constitutes extraordinary and compelling reasons for a sentence reduction." *Id.*[3]

Accordingly, this Court has authority to consider whether the worsening global pandemic, combined with the other relevant circumstances in this case, present an extraordinary and compelling basis for a sentence reduction, whether or not it falls within one of the existing categories in § 1B1.13 commentary.

### ii. COVID-19 IS AN UNPRECEDENTED AND RAPIDLY-EXPANDING GLOBAL HEALTH EMERGENCY THAT PRESENTS A SERIOUS RISK TO VULNERABLE PRISONERS.

On March 11, 2020, the World Health Organization officially classified the new strain of coronavirus which causes COVID-19 as a pandemic. *WHO Director-General's Opening Remarks at the Media Briefing on COVID-19 – 11 March 2020*, World Health Organization (Mar. 11, 2020), https://bit.ly/2W8dwpS. COVID-19 is a serious disease

---

[3] *See also United States v. O'Bryan*, No. 96-10076-03-JTM, 2020 WL 869475, at *2 (D. Kan. Feb. 21, 2020); *United States v. Maumau*, No. 2:08-cr-00758-TC-11, 2020 WL 806121, at *2-3 (D. Utah Feb. 18, 2020) ("[A] majority of district courts to consider the question have embraced Mr. Maumau's position" that limiting the catch-all provision to circumstances identified by the BOP is inconsistent with the law) (citing ten other cases); *Brown*, 411 F. Supp. 3d at 451 ("[I]f the [First Step Act] is to increase the use of compassionate release, the most natural reading of the amended § 3582(c) and § 994(t) is that the district court assumes the same discretion as the BOP Director when it considers a compassionate release motion properly before it. . . . Thus, the Director's prior interpretation of 'extraordinary and compelling' reasons is informative, but not dispositive." (internal quotation marks and citations omitted)); *United States v. Beck*, No. 1:13-CR-186-6, 2019 WL 2716505, at *6 (M.D.N.C. June 28, 2019) ("While the old policy statement provides helpful guidance, it does not constrain the Court's independent assessment of whether 'extraordinary and compelling reasons' warrant a sentence reduction under § 3582(c)(1)(A)(i).").

that makes certain populations of people severely ill and can lead to death. About 20% of COVID-19 patients require hospitalization, about 10 times more than the percentage of patients with the flu. Pien Huang, *How The Novel Coronavirus And The Flu Are Alike ... And Different*, *www.npr.org* (Mar. 20, 2020) at https://www.npr.org/sections/goatsandsoda/2020/03/20/815408287/how-the-novel-coronavirus-and-the-flu-are-alike-and-different. It estimated to kill at least 10 people per thousand infected, making it ten times more lethal than the seasonal flu. *Id.*.[4]

As of April 8, 2020, COVID-19 has infected over 1.5 million people worldwide, leading to close to 100,000 deaths. *Coronavirus COVID-19 Global Cases*, CENTER FOR SYSTEMS SCIENCE AND ENGINEERING (CSSE) AT JOHNS HOPKINS UNIVERSITY, https://coronavirus.jhu.edu/map.html (last visited April 8, 2020) (updating regularly). On March 26, 2020, the United States became the global leader in COVID infections. Tom Porter, *The US is Well on the Way to Having a Coronavirus Outbreak Worse than China's or Even Italy's*, BUSINESS INSIDER (Mar. 26, 2020), https://www.businessinsider.com/figures-show-us-soon-coronavirus-worse-china-2020-3. The number of confirmed COVID-19 cases continues to rise exponentially, but reported numbers underrepresent the true scope of the crisis—"experts believe that the United States still isn't testing enough people to detect the outbreak's true spread."[5]

---

[4] *See also* Nick Wilson et al., *Case-Fatality Risk Estimates for COVID-19 Calculated by Using a Lag Time for Fatality*, 26 EID JOURNAL (prepublication June 2020), https://wwwnc.cdc.gov/eid/article/26/6/20-0320_article.

[5] Alexis C. Madrigal & Robinson Meyer, *How the Coronavirus Became an American Catastrophe*, THE ATLANTIC (Mar. 21, 2020), https://www.theatlantic.com/health/archive/2020/03/how-many-americans-are-sick-lost-february/608521/

The severity of the coronavirus pandemic is reflected in the actions of local and national leaders, who have taken drastic measures to prevent the spread of the disease. All 50 states and the national government have declared states of emergency. *See Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak* (Mar. 13, 2020), https://www.whitehouse.gov/presidential-actions/proclamation-declaring-national-emergency-concerning-novel-coronavirus-disease-covid-19-outbreak/. Kamran Rahman & Alice Miranda Ollstein, *How States Are Responding to Coronavirus, in 7 Maps*, POLITICO (Mar. 24, 2020), https://www.politico.com/news/2020/03/24/coronavirus-state-response-maps-146144. Additionally, more than half of the states and the District of Columbia have imposed severe "lockdown" rules for their citizens. Porter, *supra*.

Conditions of imprisonment create the ideal environment for the transmission of contagious diseases. Joseph A. Bick, *Infection Control in Jails and Prisons*, 45 CLINICAL INFECTIOUS DISEASES 1047, 1047 (2007), https://doi.org/10.1086/521910. "Incarcerated/detained persons live, work, eat, study, and recreate within congregate environments, heightening the potential for COVID-19 to spread once introduced." Centers for Disease Control and Prevention (CDC), *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities* (Mar. 23, 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html. The CDC recognizes the difficulty of preventing the introduction of COVID-19 into prison

facilities:

> There are many opportunities for COVID-19 to be introduced into a correctional or detention facility, including daily staff ingress and egress; transfer of incarcerated/detained persons between facilities and systems, to court appearances, and to outside medical visits; and visits from family, legal representatives, and other community members. Some settings, particularly jails and detention centers, have high turnover, admitting new entrants daily who may have been exposed to COVID-19 in the surrounding community or other regions.

*Id.*

Crowding, inadequate ventilation, and security issues all contribute to the spread of infectious disease in jails and prisons. Martin Kaste, *Prisons and Jails Worry About Becoming Coronavirus 'Incubators'*, NPR (Mar. 13, 2020), https://www.npr.org/2020/03/13/815002735/prisons-and-jails-worry-about-becoming-coronavirus-incubators. Hand sanitizer, an effective disinfectant recommended by the CDC to reduce transmission rates, is contraband in jails and prisons because of its alcohol content. Keri Blakinger & Beth Schwarzapfel, *How Can Prisons Contain Coronavirus When Purell is a Contraband?*, ABA JOURNAL (Mar. 13, 2020), https://www.abajournal.com/news/article/when-purell-is-contraband-how-can-prisons-contain-coronavirus. Additionally, incarcerated people tend to be in poorer health than the general population. According to a recent Bureau of Justice Statistics study, approximately half of state and federal prisoners and jail inmates have chronic conditions such as cancer, high blood pressure, diabetes, cirrhosis of the liver, heart

disease, and asthma.[6] Medical care of prisoners is limited at the best of times.[7]

Because of these dangers, the public health community is insistent on the critical need to rapidly reduce our prison populations, both for the health of our inmates and the health of the community as a whole. "We need to take the unprecedented step TODAY of providing urgent release to everyone in the jails who is at risk of serious morbidity and mortality from COVID." Jennifer Gonnerman, *A Rikers Island Doctor Speaks Out to Save Her Elderly Patients from the Coronavirus*, THE NEW YORKER (Mar. 20, 2020) (quoting Rachael Bedard, Rikers Island Geriatrician), https://www.newyorker.com/news/news-desk/a-rikers-island-doctor-speaks-out-to-save-her-elderly-patients-from-the-coronavirus.

Similarly, on March 23, 2020, a bipartisan group of fourteen senators wrote to Attorney General Barr and the Director of the Bureau of Prisons to express "serious concern for the health and wellbeing" of those inmates "most vulnerable to infection."[8]

---

[6] Laura M. Maruschak et al., Medical Problems of State and Federal Prisoners and Jail Inmates, 2011-12, BUREAU OF JUSTICE STATISTICS, NCJ 248491, 1 (Rev. Oct. 4, 2016), https://www.bjs.gov/content/pub/pdf/mpsfpji1112.pdf .

[7] *See* U.S. Dep't of Justice Office of the Inspector General, *Review of the Federal Bureau of Prisons' Medical Staffing Challenges* (Mar. 2016), https://oig.justice.gov/reports/2016/e1602.pdf (finding that the BOP experienced chronic medical staff shortages and failed to take adequate measures to address them, leading to problems meeting the medical needs of prisoners, requiring the use of outside hospitals, and endangering the safety and security of institutions); U.S. Dep't of Justice Office of the Inspector General, *The Impact of an Aging Inmate Population on the Federal Bureau of Prisons* (Rev. Feb. 2016), https://oig.justice.gov/reports/2015/e1505.pdf (finding that BOP facilities and services, including medical services, were inadequate to meet the needs of an aging prison population leading to delays in medical treatment for prisoners with acute and chronic heart and neurological conditions, who wait an average of 114 days to see medical specialists); David Patton, S*tatement from Federal Defenders of New York*, FEDERAL DEFENDERS OF NEW YORK (Mar. 8, 2020), https://federaldefendersny.org/about-us/news/statement-from-federal-defenders-of-new-york.html.

[8] Letter from Senator Charles Grassley et al. (Mar. 23, 2020) (available at https://www.grassley.senate.gov/sites/default/files/Letter.%20to%20DOJ%20and%20BOP%20on%20COVID-19%20and%20FSA%20provisions%20-%20final%20bipartisan%20text%20with%20signature%20blocks.pdf.

19

They noted that "[c]onditions of confinement do not afford individuals the opportunity to take proactive steps to protect themselves, and prisons often create the ideal environment for the transmission of contagious disease." *Id.* The senators called on the BOP to use existing tools like the elderly prisoner home confinement program and compassionate release to discharge vulnerable inmates from prison. *Id.*

### iii. HILL RUNS A HIGH RISK OF SERIOUS ILLNESS OR DEATH IF HE CONTRACTS COVID-19.

The CDC and other medical authorities have clarified that COVID-19 is especially dangerous for both older people and people with severe chronic medical conditions. *See* CDC, *Older Adults* (Mar. 21, 2020), https://www.cdc.gov/coronavirus/2019-ncov/specific-groups/high-risk-complications/older-adults.html. Those with certain serious health concerns—including chronic lung disease, moderate to severe asthma, compromised immune systems, severe obesity, diabetes, high blood pressure, renal failure, and liver disease—are also especially vulnerable to and at higher risk for serious complications from COVID-19, including death. *See* CDC, *Information for Healthcare Professionals: COVID-19 and Underlying Conditions* (Mar. 22, 2020), https://www.cdc.gov/coronavirus/2019-ncov/hcp/underlying-conditions.html. In fact, research has indicated that hypertension could be one of the leading factors in COVID-19 related deaths.[9]

---

[9] *See*, Why some heart patients may be especially vulnerable to COVID-19 (Mar. 20, 2020) https://www.sciencenews.org/article/coronavirus-covid-19-why-some-heart-patients especially vulnerable; Hypertension could be a leading factor in coronavirus deaths (Mar. 12, 2020) https://www.cleveland.com/news/2020/03/hypertension-could-be-a-leading-factor-in-coronavirus deathsheres- what-to-know.html.

Mr. Hill suffers from hypertension (high blood pressure) (PRS ¶ 84) one of the high-risk complications identified by the CDC. *See infra*. As such, he is among those with the highest risk of death or serious illness from COVID-19. Yet, as an incarcerated person, it is impossible for Mr. Hill to follow the CDC's recommendations to protect himself from exposure to this highly transmissible disease. This risk of serious illness or death from the unprecedented global pandemic, together with all of the other relevant factors in this case, presents an extraordinary and compelling basis for sentence reduction.

### iv. COURTS RESPONDING TO THE CORONAVIRUS PANDEMIC HAVE RECOGNIZED THE CRITICAL IMPORTANCE OF REDUCING I\ INCARCERATED POPULATIONS.

The Courts' response to COVID-19 reflects the extreme exigency of the present circumstances, especially for those individuals most vulnerable to harm from the virus. Numerous courts have not granted compassionate release to prisoners whose age and health conditions place them in a high-risk group for serious illness or death from COVID-19.[10] In *United States v. Garlock*, for example, the district court

---

[10] *See United States v. McCarthy*, No. 3:17-CR-0230 (JCH), 2020 WL 1698732, at *1 (D. Conn. Apr. 8, 2020) (approving compassionate release where defendant was 65 and had COPD and asthma); *United States v. Hansen*, No. 07-CR-00520(KAM), 2020 WL 1703672, at *9 (E.D.N.Y. Apr. 8, 2020) (granting compassionate release where defendant was over 65 and had numerous ailments); *Gonzalez*, 2020 WL 1536155, at *3 (approving compassionate release where defendant "is in the most susceptible age category (over 60 years of age) and her COPD and emphysema make her particularly vulnerable"); *United States v. Hernandez*, No. 18-CR-834, 2020 WL 1684062, at *3 (S.D.N.Y. Apr. 2, 2020) (finding "extraordinary and compelling reasons" to reduce the defendant's sentence due to defendant's asthma and the "heightened medical risk presented to [the defendant] by the COVID-19 pandemic"); *United States v. Rodriguez*, No. 2:03-CR-00271-AB-1, 2020 WL 1627331, at *2 (E.D. Pa. Apr. 1, 2020) (granting compassionate release because for a diabetic inmate, "nothing could be more extraordinary and compelling than this pandemic"); *United States v. Campagna*, No. 16-CR-78-01, 2020 WL 1489829, at *3 (S.D.N.Y. Mar. 27, 2020) ("Defendant's compromised immune system, taken in concert with the COVID-19 public health crisis, constitutes an extraordinary and compelling reason to modify to Defendant's sentence on the grounds that he is suffering from a serious medical condition that substantially diminishes his ability to provide self-care within the environment of the RCC."); *Perez*,

extended the defendant's date for surrendering to serve an already-imposed prison sentence until September 1, 2020, concluding that no one should be entering BOP custody absent "truly extraordinary circumstances":

> By now it almost goes without saying that we should not be adding to the prison population during the COVID-19 pandemic if it can be avoided. Several recent court rulings have explained the health risks— to inmates, guards, and the community at large—created by large prison populations. . . . The chaos has already begun inside federal prisons— inmates and prison employees are starting to test positive for the virus, quarantines are being instituted, visits from outsiders have been suspended, and inmate movement is being restricted even more than usual. . . . To avoid adding to the chaos and creating unnecessary health risks, offenders who are on release and scheduled to surrender to the Bureau of Prisons in the coming months should, absent truly extraordinary circumstances, have their surrender dates extended until this public health crisis has passed.

*United States v. Garlock*, No. 18-CR-00418-VC-1, 2020 WL 1439980, at *1 (N.D. Cal. Mar. 25, 2020).

In *United States v. Copeland*, the Court granted a sentence reduction to time served under another portion of the First Step Act to a defendant serving a life sentence for a drug trafficking conspiracy and firearm possession. *United States v. Copeland*, No. 2:05-cr-00135-DCN (D.S.C. Mar. 24, 2020) (ECF No. 662). The court recognized that the defendant's "tenuous health condition" put him at "even higher risk for severe illness and possible death" from the COVID-19 pandemic. *Id.* at 7. The court considered letters from members of Congress as evidence of its "desire for courts to 'use all available powers and authorities . . . to reduce the number of federal

---

2020 WL 1546422, at *2 ("Perez meets th[e] requirement [of Application Note 1(D) ] as well, because he has weeks left on his sentence, is in weakened health, and faces the threat of a potentially fatal virus. The benefits of keeping him in prison for the remainder of his sentence are minimal, and the potential consequences of doing so are extraordinarily grave.").

prisoners in . . . prisons,'" especially for elderly and sick individuals and those within the last 36 months of their sentences who are appropriate for placement in home confinement. *Id.* (quoting Letter of House Judiciary Committee, Mar. 19, 2020).

Similarly, in *Toledo Manrique*, the district court granted bail in an extradition matter, although the individual faced a life sentence in Peru. 2020 WL 1307109, at *1. Noting that Toledo Manrique is 74 years old, the Court concluded, "[t]he risk that this vulnerable person will contract COVID-19 while in jail is a special circumstance that warrants bail." *Id.*

A sampling of the court orders granting release based on the pandemic fails to convey the full volume of building precedent. *See, e.g.*, *United States v. Kennedy*, No. 18-20315, 2020 WL 1493481, at *1 (E.D. Mich. Mar. 27, 2020) ("[T]he danger posed to Defendant in the Saginaw County Jail by the COVID-19 pandemic constitutes an independent compelling reason to temporarily release him from custody."); *United States v. Michaels*, No. SACR 16-76-JVS, 2020 WL 1482553, at *1 (C.D. Cal. Mar. 26, 2020) ("Michaels has demonstrated that the Covid-19 virus and its effects in California constitute 'another compelling reason'" justifying temporary release under § 3142(i)); *United States v. Jaffee*, No. 19-cr-00088-RDM (D.D.C. Mar. 26, 2020) (releasing defendant with criminal history in gun & drug case, citing "palpable" risk of spread in jail and "real" risk of "overburdening the jail's healthcare resources"); *United States v. Harris*, No. CR 19-356, 2020 WL 1482342, at *1 (D.D.C. Mar. 26, 2020) ("The Court is convinced that incarcerating Defendant while the current COVID-19 crisis continues to expand poses a far greater risk to community safety

than the risk posed by Defendant's release to home confinement on . . . strict conditions."); *United States v. Perez*, No. 19 CR. 297 (PAE), 2020 WL 1329225, at *1 (S.D.N.Y. Mar. 19, 2020) (releasing defendant due to the "heightened risk of dangerous complications should [h]e contract COVID-19"); *United States v. Stephens*, No. 15-cr-95 (AJN), 2020 WL 1295155, __ F. Supp. 3d __, at *2 (S.D.N.Y. Mar. 19, 2020) (releasing defendant, given "the unprecedented and extraordinarily dangerous nature of the COVID-19 pandemic").

IV. **WITH FULL CONSIDERATION OF THE § 3553(A) FACTORS, INCLUDING THE COVID-19 PANDEMIC, REDUCING HILL'S SENTENCE CONSTITUTES A SENTENCE SUFFICIENT, BUT NOT GREATER THAN NECESSARY, TO ACCOMPLISH THE GOALS OF SENTENCING**

When extraordinary and compelling reasons are established, the Court must consider the relevant sentencing factors in § 3553(a) to determine whether a sentence reduction is warranted. 18 U.S.C. § 3582(c)(1)(A)(i). Under all of the circumstances in this case, the Court should conclude that granting compassionate release to Mr. Hill, or some other sentence this Court finds appropriate, is sufficient to satisfy the purposes of sentencing. Under *Pepper v. United States*, 562 U.S. 476, 490-93 (2011), the Court can, and indeed must, consider post-offense developments under § 3553(a).

Here, the overriding factor under § 3553(a) that was not present at the time of sentencing is the COVID-19 pandemic and the serious risk it presents. Although the circumstances of the present offense qualified Mr. Hill for the serious sentence this Court originally imposed, the sentencing purpose of just punishment does not warrant a sentence that includes potential exposure to a life-threatening illness. In fact, the Eighth Amendment's prohibition on cruel and unusual punishment includes

24

unreasonable exposure to dangerous conditions in custody. *Helling v. McKinney*, 509 U.S. 25, 28 (1993); *see also Wallis v. Baldwin*, 70 F.3d 1074, 1076 (9th Cir. 1995) (applying *Helling* to exposure to asbestos); *Brown v. Mitchell*, 327 F. Supp. 2d 615, 650 (E.D. Va. July 28, 2004) (applying *Helling* to contagious diseases caused by overcrowding conditions). The § 3553(a) factors can be met in this case by an order of home confinement as a condition of supervised release.

This Court has already found in sentencing Mr. Hill, the § 3553(a) factors weighed in favor of a below-mandatory-minimum 60 month sentence. This Court states:

> I do think he has already turned his life around in a significant way. The fact that he has been employed for as long as he has steadily, that his own employer speaks so highly of him, that he has got somebody who loves him and is standing by him and will be here for him, and that he has got a supportive family that recognizes the contributions he has made, all of those factors would ordinarily move me to impose a much less severe sentence. I don't have that choice in this case, but I am doing what I can to make it as short as possible.

*See Transcript of Proceedings*, November 26, 2018 ("Tr."), pgs. 13-14.

Additionally, Mr. Hill's conduct while incarcerated, establishes that the purposes of punishment have been met. Under *Pepper*, the Court must also consider "the most up-to-date picture" of the defendant's history and characteristics, which "sheds light on the likelihood that [the defendant] will engage in future criminal conduct." 562 U.S. at 492. Since being incarcerated, Mr. Hill has not be subject to any disciplinary actions and has been an ideal inmate.

To that end, in reducing Mr. Hill's sentencing, this Court may consider the need for certain medical care when determining the sentence it believes to be

appropriate. 18 U.S.C. § 3553(a)(2)(D) (mandating consideration of "the need for the sentence imposed. . . to provide the defendant with . . .medical care, or other correctional treatment in the most effective manner"); *see United States v. Powell*, 576 F.3d 482, 499 (7th Cir. 2009) (instructing sentencing court to consider defendant's arguments about his physical infirmities and advanced age).    Even before the pandemic, the BOP was failing to provide adequate healthcare.[11] The situation has only worsened with the COVID-19 onslaught.[12]   One recent district court judge weighed this factor in granting compassionate release to an elderly defendant with underlying conditions, concluding that the defendant was "unlikely to be able to get the medical care he needs in the midst of an ongoing pandemic." *United States v. Burrill*, 2020 WL 1846788, at *3 (N.D. Cal. Apr. 10, 2020). Further, BOP staff recently filed a complaint with the Occupational Safety and Health Administration, contending that various BOP policies "are proliferating the spread of a known and

---

[11] See U.S. Dep't of Justice, *Office of the Inspector General Review of the Federal Bureau of Prison's Medical Staffing Challenges,* at i (Mar. 2016) (describing an inability to hire a sufficient number of healthcare professionals to meet the needs of a teeming incarcerated population); see also Erica Zunkel, Article: 18 U.S.C. § 3553(a)'s Undervalued Sentencing Command: Providing a Federal Criminal Defendant With Rehabilitation, Training, and Treatment in "The Most Effective Manner," 9 Notre Dame J. Int'l & Comp. L. 49, 57–60 (2019) (detailing the BOP's systematic failure to procure healthcare for inmates).

[12] *See* Lisa Freeland et al, *We'll See Many More COVID-19 Deaths in Prison if Congress and Barr Don't Act Now*, WASH. POST (Apr. 6, 2020), https://www.washingtonpost.com/opinions/2020/04/06/covid-19s-threat-prisonsargues- releasing-at-risk-offenders ("Numerous credible public-health experts have observed that overcrowded prisons with communal living; shared toilets, showers, and sinks; poor sanitation; and wholly inadequate medical care would allow covid-19 to sweep through the prison population far more quickly than the general public — with devastating consequences."); *see also* Joe Davidson, *Unions for Prison, VA Workers File "Imminent Danger" Reports about Coronavirus Conditions*, WASH. POST (Apr. 9, 2020), https://www.washingtonpost.com/politics/unions-for-prison-va-workers-fileimminent-danger-reports-about-coronavirus-conditions/2020/04/08/78962ea0-79e4-11ea-8cec-530b4044a458_story.html.

deadly contagion both within our prisons system and to our surrounding communities."[13]  Being eligible for release to a community with access to health care will dramatically reduce Mr. Hill's risk of infect or complications from COVID-19.

Waiting until there are more cases of COVID-19 at Milan CID, or worse yet, until Mr. Hill is infected will run against all considerations of justice, fairness, and reasonableness.  The totality of the circumstances demonstrates that granting Mr. Hill compassionate release is "sufficient, but not greater than necessary," to serve the purposes of sentencing under § 3553(a).

## V. THIS COURT MAY RECOMMEND TO THE BOP THAT HILL SERVE THE MAXIMUM TIME PERMITTED IN HOME CONFINEMENT

On March 13, 2020, President Trump declared the COVID-19 outbreak in the United States a national emergency that had begun on March 1, 2020.[14] In light of the pandemic, and the likelihood that some inmates would be safer serving their sentences at home than in BOP facilities, on March 26, the Attorney General directed the BOP to prioritize the use of existing statutory authorities to transfer to home confinement those at-risk inmates who are non-violent and pose minimal likelihood of recidivism.[15]

Then, on March 27, 2020, Congress enacted the CARES Act. Section

---

[13] Council of Prison Workers 33, Imminent Danger Report, at 3 (Mar. 31, 2020), available at https://www.afge.org/globalassets/documents/generalreports/coronavirus/4/osha-7-          form-national-complaint.pdf (describing BOP's policy of requiring staff to appear for work within 48 hours even after having contact with individuals showing symptoms of COVID-19, and BOP's policy of continuously moving infected defendants).

[14] White House, *Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak* (Mar. 13, 2020), https://tinyurl.com/yx3z9jjp.

[15] Memorandum from Attorney General to Director of Bureau of Prisons (March 26, 2020), https://tinyurl.com/w4nwgqp ("3/26/2020 Barr Memo").

12003(b)(2) of the CARES Act provides that, during this "covered emergency period" of the COVID-19 National Emergency, "if the Attorney General finds that emergency conditions will materially affect the functioning of the Bureau [of Prisons], the Director of the Bureau may lengthen the maximum amount of time for which the Director is authorized to place a prisoner in home confinement under the first sentence of section 3624(c)(2) of title 18, United States Code, as the Director determines appropriate."

On April 3, 2020, the Attorney General made the finding that emergency conditions are materially affecting the functioning of the Bureau of Prisons.[16] This finding "expanded the cohort of inmates who can be considered for home release."[17] Because the Attorney General made this finding under the CARES Act, the BOP Director may now review all inmates for home confinement "---not only those who were previously eligible for a transfer."[18] Although in his prior memorandum, the Attorney General had suggested inmates should be quarantined before transfer, in the 4/3/2020 Memorandum, he recognized that, where appropriate, individuals could be quarantined in the residence to which they were being transferred.[19] And he explained that "inmates with a suitable confinement plan will generally be appropriate candidates for home confinement rather than continued detention at institutions in which COVID-19 is materially affecting their operations."[20]

[16] Barr 4/3/2020 Memo at 1.
[17] Id.
[18] Id. at 2.
[19] Id.
[20] Id.

COVID-19 is materially affecting the operations of all BOP facilities, as reflected by the fact that the Bureau has placed all facilities on a 14-day lockdown.[21] Although some facilities have already experienced mass outbreak and multiple deaths, this does not diminish COVID-19's impact on those facilities that are not there—yet—and transfer to home confinement is not a zero-sum game. As the Attorney General exhorted, "time is of the essence."[22] As of April 14, 2020, lockdown has been extended indefinitely.

Courts are permitted to make post-sentence recommendations that the BOP consider RRC or home detention placement—those recommendations are one of the factors considered under 18 U.S.C. § 3621(b). *E.g., United States v. Buckley*, 2018 WL 6067437, at *1-2 (E.D. Cal. Nov. 20, 2018); *United States v. Turnquist*, 2018 WL 2460286, at *1-2 (E.D. Cal. May 31, 2018), *United States v. Collins*, 2018 WL 1157508, at *1-2 (E.D. Cal. Mar. 5, 2018); *United States v. Ellis*, 2017 WL 4641489, at *2-3 (N.D. Cal. 2017); *United States v. Miranda*, 2017 WL 3219941, at *2-3 (S.D. Cal. 2017) (home detention); *United States v. Bhamani*, 2017 WL 2992455, at *1-2 (E.D. Cal. 2017). Several courts have made those recommendations during this COVD-19 global pandemic. *United States v. Fobbs*, CR 19-410 WHA, Docket No. 32 (N.D.Cal. Apr.7, 2020) ("For the reasons stated on the record and given defendant's heightened susceptibility to a severe coronavirus infection, the Court recommends to BOP that defendant be placed in home confinement for the remainder of his custodial sentence."); *United States v. Powell*, No. 94-cr-316, ECF No. 95 (D.D.C. Mar. 24, 2020)

---

[21] COVID -19 Action Plan: Phase 5 (March 31, 2020), https://tinyurl.com/rb9umrx.
[22] Barr 4/3/2020 Memo at 2.

("Given the current COVID-19 global pandemic and the parties' joint request, the Court recommends that the Bureau of Prisons immediately place Samuel Powell into home confinement to serve the remainder of his prison term" under conditions).

### a. HILL'S CONTINUED INCARCERATION WITHIN THE BOP HAS POTENTIAL TO PROSE GRAVE DANGERS TO HIS HEALTH AND THE HEALTH OF OTHER INMATES AND STAFF

As discussed above, Mr. Hill suffers suffers from hypertension (high blood pressure), one of the high-risk complication identified by the CDC. See infra. As such, he is among those with the highest risk of death or serious illness from COVID-19. Yet, as an incarcerated person, it is impossible for Mr. Hill to follow the CDC's recommendations to protect himself from exposure to this highly-transmissible disease.

Mr. Hill is incarcerated at the minimum-security camp at Milan FCI. Although the facility itself only reported eight positive tests, this is hardly surprising given the unavailability of tests. It has been widely reported that BOP is unable to test even all sick inmates, much less those who are asymptomatic,[23] and the BOP is therefore necessarily underreporting the numbers.[24] On April 4, 2020, ABC news reported that the Warden at MCC New York responded to a court order to test an inmate by explaining that the facility lacks COVID-19 tests.[25] Indeed, according to information and statistics that BOP provided to Congress on April 7, 2020, its website

[23]*See, e.g..,* Keegan Hamilton, *Sick Staff, Inmate Transfers, and No Tests How the U.S. is Failing Federal Inmates as Coronavirus Hits*, Vice (Mar. 24, 2020), https://tinyurl.com/sxprjxr.
[24]*See, e.g.,* Walter Palvo, *Bureau of Prisons Underreporting COVID-19 Outbreaks in Prison*, Forbes (Apr. 1, 2020), https://tinyurl.com/ssyg4zv.
[25]James Hill and Luke Barr, *No COVID-19 tests available for prisoners at center of New York outbreak, court documents show*, ABCNews (April 4, 2020), https://tinyurl.com/r5zzapn.

lists only lab positive tests. As of April 7, 2020, it has additional "open" cases, which they defined as "suspected, presumed positive, or clinically confirmed." Of these, 456 people are in isolation, and 3,850 are in quarantine.

BOP has announced it will begin its review at FCI Oakdale, FCI Danbury and FCI Elkton, facilities specifically named in the 4/3/2020 Barr Memorandum, and other "similarly-situated facilities."[26] There have been multiple inmate deaths at FCI Oakdale and Elkton, both low-security facilities, and BOP is reporting 40 COVID-19 positive cases at FCI Danbury. But COVID-19 is materially affecting the operations of all BOP facilities, as reflected by the fact that the Bureau had placed all facilities on a 14-day lockdown. Transfer to home confinement is not a zero-sum game.

The government will presumably claim that Mr. Hill is safe in custody is contradicted by the realities of institutional confinement, BOP's documented failure to provide adequate care, and the consensus of public health experts that decarceration is necessary to slow COVID-19's transmission.[27]

Even in the best of times, prisons and jails have "long been known to be associated with high transmission probabilities of infectious diseases." Incarcerated individuals "are at special risk of infection" and "infection control is challenging." Prisons and jails "contain high concentrations of people in close proximity and are breeding grounds for uncontrolled transmission [of infection]." Incarcerated individuals share bathrooms, sinks, and showers. They eat together, and sleep in

---

[26] BOP, Update on COVID-19 and Home Confinement (April 5, 2020), https://tinyurl.com/yx6ehtp2
[27] Unless otherwise noted, documentation for the following assertions may be found in the April 1, 2020, letter from the Federal and Community Defenders to the Attorney General, attached as Exhibit F to the Declaration of Counsel.

close proximity to each other. They often lack access to basic hygiene items, much less the ability to regularly disinfect their living quarters. "The conditions and reality of incarceration makes prisons and jails tinderboxes for the spread of disease." In short, "our jails are petri dishes."

BOP is not exempt from this reality. A 2015 Bureau of Justice Statistics report found that persons incarcerated in state and federal prisons and jails were more likely than the general population to have a chronic condition or an infectious disease. And BOP and its staff have acknowledged that infection control is difficult in the prison setting. BOP facilities remain overcrowded. Low, medium, and high facilities are all operating at overcapacity and BOP's total inmate population exceeds the rated capacity of its prisons by an average of 12 to 19 percent.

Simply put, CDC recommendations such as social distancing are "impossible to achieve in our federal prisons and immigration facilities as things currently stand." Locking people in their cells for the next 14 days will not change this fact. A chorus of public health experts has confirmed that immediate decarceration is necessary to avoid a humanitarian crisis in our prisons and jails. Correctional experts agree, warning that "America's 7,000 jails, prisons, juvenile and immigration detention centers are completely unequipped to handle this pandemic, and absent swift action, we will "see devastation that is unbelievable."

Although the government will no doubt assure this Court that the situation in BOP facilities is under control and that detention in BOP facilities is safer than release to the community, these representations are demonstrably false. On March

26, the Director pointed to the low rate of infection within BOP's facilities as a testament to its planning and effectiveness.[28] But, as of April 7, 2020, the number of COVID-19 cases in the BOP was rising at a rate eight times that of the general population.[29]

BOP's modified operations policy, even as written, is woefully inadequate and—as the increasing number of positive cases demonstrate—all but ensure the rapid transmission of COVID-19 within its facilities. The protocol is deficient in several ways. First, the modified operations do not sufficiently address pre-symptomatic spread of COVID-19 among staffers, contractors, and inmates. For example, only BOP staff at medical referral centers or in areas of the country with "sustained community transmission" are subjected to "[e]nhanced screening." And this "enhanced screening" only requires temperature checks and self-reporting—it does not require staff to disclose whether they have been in high risk areas or venues or exposed to other symptomatic people. Since most COVID-19 transmission occurs pre-symptomatically, and some people show no symptoms at all, these "enhanced screenings" are simply inadequate. The screening tool used for prison contractors is similarly defective.

In any case, BOP's own staff reports that the agency is failing to respond to COVID-19 in its facilities. The accounts are staggering: the New York Times "spoke[] with more than a dozen workers in the Bureau of Prisons," who reported that "federal

[28] Statement from BOP Director (Mar. 26, 2020), https://tinyurl.com/smchalg.
[29] BOP-Reported Positive Tests for COVID-19 Nationwide, https://tinyurl.com/wm8m74v/.

prisons are ill-prepared for a coronavirus outbreak. Many lack basic supplies like masks, hand sanitizer, and soap." A BOP employee in Atlanta explained that staff does not have enough gloves, masks, or other supplies to respond to this outbreak. Nor do they "have enough space to properly quarantine inmates." Staff at FCI Tallahassee, a low-security facility, described a potential outbreak as "mass chaos," and confirmed that BOP is "just not prepared to handle something of that nature." According to an email reviewed by The Marshall Project, after a senior correctional officer transported a sick prisoner (who on March 28, 2020, became BOP's first COVID-19-related fatality) from FCI Oakdale to a community hospital, the Bureau of Prisons' chief health officer in Washington ordered the correctional officer back to work unless and until he showed symptoms.[30]

### b. HILL WILL POSE NO DANGER TO PUBLIC SAFETY

As noted above, on March 26, 2020, the Attorney General issued a memo regarding the prioritization of home confinement as appropriate in response to the COVID-19 Pandemic. Although the memorandum has been effectively superseded by the Attorney General's April 3, 2020, and its progeny, memo which provides that "inmates with a suitable confinement plan will generally be appropriate candidates for home confinement rather than continued detention at institutions in which COVID-19 is materially affecting their operations," even under the non-exhaustive list of discretionary factors concerning public safety set forth in the earlier memorandum, this Court should recommend Mr. Hill's transfer.

---

[30] Joseph Neff and Keri Blakinger, *Federal Prisons Agency "Put Staff in Harm's Way" of Coronavirus*, Marshall Project (April 3, 2020); https://tinyurl.com/yx29avmj.

Mr. Hill is currently housed at a minimum-security camp at Milan FCI.

Mr. Hill's conduct while incarcerated has established a clear record of conduct and maintained it through his term of confinement.

Mr. Hill has a demonstrable and verifiable re-entry plan where he would be able to self-quarantine: he would where he lived during pretrial release, a single family home located at 8407 South Paulina Street, Chicago, Illinois. Transferring the remainder of Mr. Hill's sentence to home confinement, together with his already imposed conditions of supervised release, weight in favor of granting this motion.

Mr. Hill's crime of conviction is no doubt serious. Nevertheless, he poses no danger to the public. There were no allegations of the use of weapons or firearms. There were no allegations of violence or threats of violence. There were no allegations that Mr. Hill did anything more than introduce two people to each other; he did not intend to purchase controlled substances or distribute them. As this Court has previously noted in granting pretrial release to another defendant, he would be returning into a world that is quite different from the one that existed when he was arrested.

## CONCLUSION

Wherefore, for the reasons stated above, Christopher Hill respectfully requests that this Honorable Court grant this motion for a reduction of sentencing and to recommend to the BOP that he be transferred to home confinement, or in the alternative community corrections, for the maximum period permissible under the CARES Act. Further, Mr. Hill does not object to this Court modifying his term of

supervised release to include home detention for a period of time equal to the remaining term of incarceration he would serve without this Court's modification order.

Respectfully submitted,

/s Vadim A. Glozman
*Attorney for Christopher Hill*

Vadim A. Glozman
VADIM A. GLOZMAN LTD.
53 W. Jackson Blvd., Suite 1410
Chicago, IL 60604
(312) 726-9015

## CERTIFICATE OF SERVICE

I, Vadim A. Glozman, an attorney for Defendant Christopher Hill, hereby certify that on this, the 1st day of June, 2020, I filed the above-described document

on the CM-ECF system of the United States District Court for the Northern District

of Illinois, which constitutes service of the same.

Respectfully submitted,

*/s/ Vadim A. Glozman*____

Vadim A. Glozman
VADIM A. GLOZMAN LTD.
53 W. Jackson Blvd., Suite 1410
Chicago, IL 60604
(312) 726-9015