# UNITED STATES DISTRICT COURT FOR
# THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 16 CR 392-1 |
| | ) | |
| RORY CONNOLLY, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## DEFENDANT RORY CONNOLLY'S
## MOTION FOR COMPASSIONATE RELEASE

Defendant, Rory Connolly, by and through his attorneys, Michael F. Clancy and Patrick W. Blegen, respectfully moves the Court, pursuant to 18 U.S.C. § 3582(c)(1)(A)(i) and 18 U.S.C. § 3553(a), for an order granting Compassionate Release. Defendant makes this request for a reduction in sentencing based on the circumstances which satisfy the "extraordinary and compelling reasons" standard under 18 U.S.C. § 3582(c)(1)(A)(i), as elaborated by the Sentencing Commission in U.S.S.G. § 1B1.13: Mr. Connolly has chronic bronchitis and sleep apnea, and is prescribed Prednisone and an inhaler.[1] He is confined at FCI Elkton, a facility overrun with COVID-19. Mr. Connolly has sought administrative relief, but has been denied by FCI Elkton's warden, Mark Williams, on May 4, 2020 (denied

---

[1] Mr. Connolly has reported to counsel that he has chronic bronchitis and sleep apnea, and is prescribed Prednisone and an inhaler. As of this writing, counsel has been unable to obtain Mr. Connolly's BOP medical records.

release to home confinement), and May 6, 2020 (denied compassionate release or a sentence reduction).

Mr. Connolly received a sentence of 80 months in prison. He has served half of that sentence, and according to the Bureau of Prison's website, is scheduled to be released November 4, 2023.

Mr. Connolly respectfully requests that the Court consider the above, as well as the factors articulated below, and grant his motion for compassionate release by reducing his sentence to time served, or in the alternative, a sentence of home incarceration for the remainder of his custody.

## I.    Brief Factual Background

After pleading guilty to marijuana distribution, Mr. Connolly was sentenced to 80 months in prison by the Honorable Charles Kocoras. Mr. Connolly was assigned to FCI Elkton in Lisbon, Ohio. He has served approximately half of his sentence. FCI Elkton has been hit hard by COVID-19. Nine prisoners have died, and about one-fourth of the inmates there have tested positive for the virus.

In April, Judge James Gwin of the Northern District of Ohio ordered the BOP to transfer and release hundreds of inmates at FCI Elkton due to the horrific conditions there. In his order, Judge Gwin indicated that detention at FCI Elkton amounts to cruel and unusual punishment prohibited by the Eighth Amendment. The Sixth Circuit Court of appeals affirmed Judge Gwin's order last month.

Mr. Connolly administratively requested to be released to home confinement. FCI Elkton warden Mark Williams denied that request on May 4, 2020. The letter denying Mr. Connolly's request to be released to home confinement is attached

hereto as Exhibit A. Mr. Connolly submitted a request to the Warden for

compassionate release or a reduced sentence.  Warden Williams denied that request

on May 6, 2020.  The letter denying this request is attached hereto as Exhibit B.

Mr. Connolly now asks this Honorable Court for relief.

## II.    The COVID-19 Crisis in Prisons

### A.    Prison conditions demonstrate the BOP cannot control COVID-19.

In courts around the country, prosecutors have argued that inmates are

safely quarantined in jails and prisons.[2] Despite officials' best intent and efforts,

prisons are, quite simply, unequipped to control COVID-19.

#### 1.    COVID-19 is incredibly infectious.

As this Court is now undoubtedly aware, the virus is wildly infectious. It

survives "on surfaces for days."[3] But its real danger is described in a single word:

aerosol. Unlike many diseases, "the virus can remain viable and infectious in

aerosols for hours"—just breathing will spread the virus, no cough or sneeze

required.[4] In a study soon-to-be-published in a Centers for Disease Control journal,

researchers confirmed what was already suspected: "SARS-CoV-2 aerosol was

detected" in air samples taken in hospital ICUs and general wards up to four

---

[2] *See, e.g.*, *United States v. Harthill*, No. 19-cr-217 (E.D. Wa. 2019) (ECF No. 29 at 7:5) (arguing proposed release address is "not shown to be safer . . . than his current housing situation" in the jail).

[3] Mary Van Beusekom, *U.S. studies offer clues to COVID-19 swift spread, severity*, Cntr. for Infectious Disease Research & Policy (Mar. 18, 2020) (available at: https://bit.ly/3b9fk70).

[4] *See id.*

meters from infected patients.[5] And that result is echoed by the National Academy of Sciences. In a letter dated April 1, 2020, Dr. Harvey Fineberg, Chair of the National Academy of Medicine's committee on emerging infectious disease, reported that all available studies were showing "aerosolization of [the] virus from normal breathing."[6] He noted how seemingly slight movements can stir up the virus into the air: simply the "doffing of PPE [personal protective equipment], the cleaning of floors, or the movement of staff" may be enough to re-suspend "virus-laden aerosol."[7] Only the 1918 Spanish Flu is thought to be more infectious.[8]

Prison officials are powerless to reduce breathing, coughing, sneezing, or movement in the cramped, shared spaces of prisons—the phone blocks, the showers, the legal libraries. Just as it spreads easily in the most controlled environments, hospitals, the virus spreads easily in the least prepared, prisons.

### 2. The spread in prisons shows prisons cannot control the spread.

The best evidence that BOP cannot control the spread of coronavirus is that BOP has not controlled the spread of coronavirus. BOP first began issuing medical

---

[5] Guo Zhen-Dong, et al., *Aerosol and surface distribution of severe acute respiratory syndrome coronavirus 2 in hospital wards, Wuhan, China*, Emerging Infectious Disease (July 2020) (available at: https://bit.ly/2xqvx98) (peer-reviewed journal published by the Centers for Disease Control). The study found that even in hospitals, the "virus was widely distributed on floors, computer mice, trash cans, and sickbed handrails." *Id.*

[6] Letter from Dr. Harvey Fineberg, Nat'l Acad. of Med., to Kelvin Droegemeier, Ph.D., Office of the President (Apr. 1, 2020) (available at: https://bit.ly/3b5aUhb).

[7] *Id.* at 2.

[8] Beyrer Decl. ¶ 10 (each carrier is estimated to infect 3 others on average); attached hereto as Exhibit D).

4

and screening guidance in January and February, it instituted a nationwide lockdown on March 24th, and yet, BOP's self-reported numbers establish a rising curve.

The numbers, as bad as they are, appear to drastically underreport what is actually happening. In at least one facility, BOP has declared all inmates presumptively infected, stopped testing altogether, and is refusing to release infection estimates.[9] One BOP employee told news reporters that "the Bureau is playing with these numbers . . . , if they don't test 'em and they don't get confirmed they don't have to be reported."[10]

Apart from the questionable numbers, BOP fails to consistently follow its own policies. Staff who should be quarantined after exposure are not.[11] Prisons are failing to stock basic essentials like soap.[12] The situation is so poor that a union representing 30,000 BOP employees has filed an OSHA complaint because "staff

---

[9] Nicholas Chrastil, *Louisiana Federal Prison No Longer Testing Symptomatic Inmates for Coronavirus Due To 'Sustained Transmission,'* The Lens (Mar. 31, 2020) (available at: https://bit.ly/34Az7tf) ("But the spokesperson said that the BOP would not be releasing the number of presumed positive cases, making it impossible to know how many prisoners at the facility have actually contracted the virus.").

[10] Nicholas Chrastil, *Louisiana Federal Prison No Longer Testing Symptomatic Inmates for Coronavirus Due To 'Sustained Transmission,'* The Lens (Mar. 31, 2020) (available at: https://bit.ly/34Az7tf).

[11] Joseph Neff & Keri Blakinger, *Federal Prisons Agency "Put Staff in Harm's Way" of Coronavirus*, The Marshall Project (Apr. 3, 2020) (available at: https://bit.ly/2VkWuTC).

[12] *See* Letter from Jerrold Nadler, Chair, House Judiciary Comm., to William Barr, Att. Gen., at 1 (Apr. 10, 2020) ("Reports from inside the Oakdale facility indicate that there is a continuing lack of availability of personal hygiene products and that general sanitation is lacking.") (citing Sadie Gurman et al., *Coronavirus Puts Prison Under Siege*, Wall Street Journal (Apr. 6, 2020) (available at: https://on.wsj.com/3a4TD6K).

who were screened and ordered home" based on the screening tool shown above were "ordered back to work within 48 hours."[13]

Even in BOP's most critical facilities, they are powerless to stop the contagion. On April 3, 2020, the Government opposed a release motion for an inmate in FCI Butner, citing screening, visitation lockdown, social distancing, and other BOP pandemic policies.[14] On March 24, 2020, Butner had its first reported case. By April 14, 2020, four inmates were dead. Forty-five were confirmed infected. Another 25 staff were infected.[15]

Moreover, that BOP is powerless to prevent the spread of COVID-19 in prisons is further evidenced by the rising number of COVID-19 positive cases in prisons that have up until recently have had zero positive cases. For example, Terra Haute USP did not see its first COVID-19 positive inmate until May 16, 2020, and its COVID-19 positive cases have continued to rise.[16] Therefore, it cannot be said that BOP can prevent COVID-19 from entering prisons, nor can it be said that the BOP officials have control of the situation.

---

[13] *See* Lia Russell, *Union warns of coronavirus exposure in federal prisons, VA facilities* (Apr. 7, 2020) (available at: https://bit.ly/3a5r3C9).

[14] *United States v. Rumley*, 08-cr-5 (W.D. Va., April 3, 2020) (ECF No. 185 at 4–7).

[15] Bur. of Prisons, *Covid-19* (available at: https://www.bop.gov/coronavirus/) (last visited: Apr. 14, 2020).

[16] Bur. of Prisons, *Covid-19* (available at: https://www.bop.gov/coronavirus/) (last visited: Apr. 14, 2020).

This is no surprise to doctors and epidemiologists. Prisons "have long been known to be associated with high transmission" of infectious diseases like "tuberculosis, multi-drug resistant tuberculosis, MRSA, and viral hepatitis,"[17] says Dr. Chris Beyrer, a medical doctor and epidemiologist at Johns Hopkins currently working on the pandemic response.[18] The virus is 5–35 times more deadly than influenza, and one-in-five infected will require medical intervention.[19] The BOP is simply unable to hospitalize such a large percentage of the inmate population.

The virus continues to spread, and despite well-intentioned BOP officials, the agency is ill-equipped to confront one of the most infectious and deadly diseases of the last century.

B.     Prison Conditions at FCI Elkton.

Of the Bureau of Prisons' 122 facilities, FCI Elkton is one of the worst places to be for an inmate with underlying health conditions. Nine inmates from FCI Elkton have died from COVID-19.[20] Hundreds of additional inmates have tested

---

[17] Beyrer Decl. ¶ 11.

[18] *See also,* Joseph A. Bick, *Infection Control in Jails and Prisons*, 45 Clinical Infectious Diseases, 1047, 1047 (2007) (available at: https://doi.org/10.1086/521910); Cntrs. for Disease Control & Prevention, *Interim Guidance on Mgmt. of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities* (Mar. 23, 2020) (available at: https://bit.ly/2VufGhP) ("There are many opportunities for COVID-19 to be introduced into a correctional or detention facility, including daily staff ingress and egress.").

[19] Beyrer Decl. ¶ 5.

[20] Bur. of Prisons, *Covid-19* (available at: https://www.bop.gov/coronavirus/) (last visited: Jun. 4, 2020).

positive for COVID-19.[21]  As of this writing, 438 inmates are currently COVID-19 positive at FCI Elkton.[22] The conditions at FCI Elkton remain dire.

On April 3, 2020, Attorney General Barr issued a Memorandum to the Director of BOP which directly provided that BOP was to "Immediately Maximize Transfers to Home Confinement of All Appropriate Inmates" held at FCI Elkton.[23] Attorney General Barr specifically identified FCI Elkton as one of the three BOP institutions that is unfortunately experiencing "significant levels of infection." This remains true.

On April 13, 2020, the ACLU of Ohio filed a lawsuit seeking an Emergency Writ of Habeas Corpus and other relief in the United States District Court for the Northern District of Ohio. (Case No. 20-cv-00794, Dkt. 1). A copy of the complaint is attached hereto as Exhibit C. The factual allegations as found in the complaint, including in its declarations, are incorporated herein as if fully set forth.

After the lawsuit was filed, FCI Elkton sought to delay the release and transfer of medically vulnerable inmates.  A panel of the Sixth Circuit unanimously denied Elkton's request, underscoring the urgent need to respond to the crisis at Elkton before it is too late.  (Case No. 20-3447, Dkt. 23-2)  Per the Sixth Circuit's order, due to its dormitory-style structure, Elkton is unable to implement or enforce social distancing. (Case No. 20-3447, Dkt. 23-2)

---

[21]*See id.*

[22] Bur. of Prisons, *Covid-19* (available at: https://www.bop.gov/coronavirus/) (last visited: Jun. 9, 2020).

[23] *See https://www.justice.gov/file/1266661/download.*

The class action lawsuit filed by the ACLU on behalf of FCI Elkton inmates and against the BOP has resulted in injunctive relief requiring the BOP to identify a subclass of inmates who were "medically vulnerable." *(*Case No. 20-cv-00794, Dkt. 22)[24] Undoubtedly, FCI Elkton is home to one of the worst outbreaks in the nation, and highlights how quickly the virus spreads in prisons set up in dormitory fashion. The risks to Mr. Connolly's life and health are clearly heightened due to the particularly rampant and deadly COVID-19 outbreak in his particular institution.

## III. Legal Background

### A. Compassionate Release Under 18 U.S.C. § 3582(c)(1)(A).

As amended by the First Step Act, 18 U.S.C. § 3582(c)(1)(A) authorizes courts to modify terms of imprisonment as follows: The court may not modify a term of imprisonment once it has been imposed except that—in any case—the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds

---

[24] Among other things, the District Court ordered FCI Elkton "to evaluate each subclass member's eligibility for transfer out of Elkton through any means, including but not limited to compassionate release, parole or community supervision, transfer furlough, or non-transfer furlough within two (2) weeks." (Case No. 20-cv-00794, Dkt. 22, pp. 20-21).

that-- (i) extraordinary and compelling reasons warrant such a reduction . . . and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission.

## B. The CARES Act and Attorney General Barr's Directive Regarding Home Confinement.

BOP's compassionate release authority under 18 U.S.C. § 3582(c)(1)(A) and the newly enacted home confinement release authority under the CARES Act Section 12003(b)(2) permit the Director of the BOP to lengthen the maximum amount of time that a prisoner may be placed in home confinement if the Attorney General finds that emergency conditions will materially affect the functioning of the BOP. "Previous law dictated that the Director of the BOP had authority to place a prisoner in home confinement for the shorter of 10 percent of a person's term of imprisonment or 6 months, but the CARES Act greatly expand[ed] that authority to allow prisoners to be transferred to home confinement earlier in their sentence."[25] The CARES Act permits the Director of the BOP to lengthen the maximum term of home confinement to whatever he determines appropriate during the pandemic.[26] The CARES Act also permits AG Barr to direct the BOP to use Home Confinement when emergency conditions exist.

On March 26, 2020, Attorney General William Barr issued a directive to the Director of the BOP prioritizing home confinement as appropriate in response to the

---

[25] March 26, 2020, Letter to AG Barr and BOP Director Carvajal from FAMM President Kevin Ring (available at: https://famm.org/wp-content/uploads/Barr-ltr-re-home-confinement-covid.pdf) (last visited May 25, 2020).

[26] *See id.*

COVID-19 pandemic to decrease risk to their health. In his directive, Mr. Barr stated: "In assessing which inmates should be granted home confinement pursuant to this Memorandum, you are to consider the totality of circumstances for each individual inmate, the statutory requirements for home confinement, and the following non-exhaustive list of discretionary factors": (1) the age and vulnerability of the inmate to COVID-1 9, in accordance with the Centers for Disease Control and Prevention (CDC) guidelines; (2) the security level of the facility currently holding the inmate, with priority given to inmates residing in low and minimum security facilities; (3) the inmate's conduct in prison; (4) the inmate's score under PATTERN; (5) whether the inmate has a demonstrated and verifiable re-entry plan that will prevent recidivism and maximize public safety.[27]

## IV.   Mr. Connolly has Exhausted his Administrative Remedies

Mr. Connolly sought to remedy his situation administratively.  He petitioned FCI Elkton to be placed on home confinement.  He also requested a reduction in sentence based on underlying health conditions and concerns about COVID-19. Those requests were denied by the warden on May 4, 2020, and May 6, 2020, respectively. *See* Exhibits A and B.

---

[27] *See* https://www.justice.gov/file/1262731/download.

## V. Several of the Factors Listed in AG Barr's Directive to the BOP Entitle Mr. Connolly to Compassionate Release.

At the time Mr. Barr issued his April 3, 2020, memo, there were 91 inmate and 50 staff positive cases reported.[28] Those numbers have since increased dramatically— more than 5,000 inmates and more than 600 staff who have tested positive for COVID-19.[29] Though those figures, of course, do not accurately reflect the illness and the potential problems associated with deadly virus spread in prison.[30] Based on the factors listed in AG Barr's March 26, 2020, directive, Mr. Connolly was entitled to compassionate release at the time his request was submitted to the warden; Mr. Connolly should still be entitled to compassionate release based on these same factors.

---

[28] Federal Judges Are Relying on Bureau of Prisons COVID-19 Numbers to Make Rulings (available at: https://www.forbes.com/sites/walterpavlo/2020/05/20/federal-judges-are-relying-on-bureau-of-prisons-covid-19-numbers-to-make-rulings/#6bc1cbf012c7) (last visited June 2, 2020).

[29] Bur. of Prisons, *Covid-19* (available at: https://www.bop.gov/coronavirus/) (last visited: June 2, 2020).

[30]*See* Federal Judges Are Relying on Bureau of Prisons COVID-19 Numbers to Make Rulings (available at: https://www.forbes.com/sites/walterpavlo/2020/05/20/federal-judges-are-relying-on-bureau-of-prisons-covid-19-numbers-to-make-rulings/#6bc1cbf012c7) (last visited May 25, 2020).

**A.** **The vulnerability of the inmate to COVID-19, in accordance with the Centers for CDC guidelines.**

Researchers have posited that sleep apnea may increase the risk of severe COVID-19.[31] In addition, underlying respiratory conditions such as bronchitis and sleep apnea may increase the risk of serious COVID-19 for individuals of any age.[32]

**B.** **The security level of the facility currently holding the inmate, with priority given to inmates residing in low and minimum security facilities.**

FCI Elkton is a low-security prison.

**C.** **Whether the inmate has a demonstrated and verifiable re-entry plan that will prevent recidivism and maximize public safety.**

If released, Mr. Connolly would live at his sister's rental unit in Chicago. He would self-quarantine for at least a two-week period, and then plans to assist with the care of his daughter, who has a weakened immune system. PSR ¶ 70.

**VI.** **Consideration of the § 3553(a) Factors Entitle Mr. Connolly to Compassionate Release.**

The Court begins with the factors set out in 18 U.S.C. § 3553(a). Mr. Connolly is currently serving an 80-month term of imprisonment. He has been incarcerated since 2018 and has already served half of his 80-month sentence.

Mr. Connolly is a veteran, previously serving in the Illinois Army National Guard. Mr. Connolly joined the Illinois Army National Guard at age 17. He was activated shortly after the events of September 11, 2001, and deployed to Germany

---

[31] *See* "Sleep apnea may increase the risk of severe COVID-19, say researchers" (available at: news-medical.net) (May 19, 2020).

[32] *See* "If you are at higher risk" (available at: health.harvard.edu) (updated May 6, 2020).

until approximately 2002 or 2003. He then returned to the United States and was stationed in Illinois and Delaware. Mr. Connolly excelled in the military, earning numerous commendations including the Army Service Ribbon and the National Defense Service Medal. He was promoted twice, ultimately achieving the rank of E-4 Specialist, and also became a certified railroad mechanic.

With regard to his health issues, Mr. Connolly has reported to counsel that he suffers from chronic bronchitis and sleep apnea and has been prescribed Prednisone and an inhaler by BOP.[33] Both chronic bronchitis and sleep apnea are respiratory diseases. According to the CDC, certain underlying health conditions, which include chronic respiratory diseases such as COPD and sleep apnea, result in a higher mortality rate for patients who have contracted COVID-19.[34] According to the CDC, the fatality rate for patients with other health problems ranges from 6 to 10.5%, compared to 0.9% for otherwise healthy patients.[35] Despite Mr. Connolly's underlying respiratory issues, he was not on the list of inmates internally identified by Elkton as medically vulnerable. Nonetheless, Mr. Connolly's chronic bronchitis and sleep apnea are COVID-19 risk factors.

---

[33] While counsel do not have copies of Mr. Connolly's BOP medical records, Mr. Connolly has reported to counsel that he has chronic bronchitis and sleep apnea, and is prescribed Prednisone and an inhaler.

[34] *See* (available at https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html) (last visited Jun. 4, 2020*); see also* Coronavirus Concerns for Patients with Sleep Apnea (available at: https://www.sleephealthsolutionsohio.com/blog/coronavirus-sleep-apnea-cpap-therapy/) (last visited Jun. 4, 2020).

[35]*See id.*

The precarious health situation of his daughter should also be taken into account, as Mr. Connolly's daughter has a low white blood cell count which renders her immunocompromised, and suffers from Molluscum Contagiosum, a skin condition that is exacerbated for those who have a weakened immune system. PSR ¶ 70. Mr. Connolly wishes to care for his daughter and ensure her health and safety both in general and particularly in light of her risk of serious complications should she contract COVID-19.

Mr. Connolly finds himself in a harrowing situation at FCI Elkton, and is potentially a matter of life and death. He has two underlying conditions that severely increase his risk of suffering complications from this dangerous virus. BOP in general, and FCI Elkton in particular, have proven themselves ill-equipped to handle this pandemic. As such, compassionate release is appropriate in this case. Mr. Connolly has exhausted his administrative remedies. Action is needed now, and Mr. Connolly asks the Court to consider the conditions at Elkton in conjunction with his compelling request under 18 U.S.C. §3582(c)(1)(A)(i).

## VII. Extraordinary and Compelling Reasons Exist Warranting Mr. Connolly's Compassionate Release.

The Court must also consider whether "extraordinary and compelling reasons warrant such a reduction" and is "consistent with applicable policy statements issues by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A). The relevant policy statement, Section 1B1.13 of the Sentencing Guidelines, explains that a sentence reduction under § 3582(c)(1)(A) may be ordered. The Commentary to Section 1B1.13 also provides certain circumstances constituting "extraordinary

and compelling reasons" that warrant a sentence reduction. *Coles,* 2020 WL 1976296 at *6 (citing U.S.S.G. § 1B1.13 cmt. n. 1).

In *United States v. Early*, No. 09-CR-282, 2020 WL 2112371 (N.D. Ill May 4, 2020), the district court found that extraordinary and compelling reasons existed warranting a sentence reduction under § 3582(c)(1)(A):

> The first question is whether there are "extraordinary and compelling reasons" warranting a reduction. Mr. Early contends that the coronavirus outbreak poses a great risk to his health and life as long as he remains incarcerated. He is 62 years old. He suffers from several medical conditions, including diabetes and hypertension. And his counsel says that Mr. Early had a heart attack at some point when he was in custody at the Chicago Metropolitan Correctional Center. These conditions place Mr. Early in the category of those who face a higher risk of severe illness if they contract the coronavirus. See https://www.cdc.gov/coronavirus/2019-ncov/need-extraprecautions/people-at-higher-risk.html (last visited May 2, 2020). Mr. Early also contends that the conditions at FCI Terre Haute, where he is incarcerated, also put him at greater risk of contracting the virus. At present, there are no confirmed cases of coronavirus among either staff or incarcerated persons at the prison, see https://www.bop.gov/coronavirus/index.jsp (last visited May 2, 2020), but the Court has no solid information about how much testing has been done, and it is only fair to say that the fact that there are no confirmed cases does not mean that no one in the prison has contracted the coronavirus. And if and when that happens, it is likely to spread more quickly than in the general population due to, among other things, the difficulty of accomplishing social distancing in a prison environment and the constant influx of people coming and going from outside the prison, including correctional staff. On the other hand, it appears that the vast majority of those who contract coronavirus do not suffer serious illness, and many remain entirely asymptomatic. That said, the Court cannot discount the risk to Mr. Early if he contracts coronavirus, as reliable information places him in a higher-risk category. This, in the Court's view, qualifies as an extraordinary reason warranting consideration of a reduction of Mr. Early's sentence.

*Early*, 2020 WL 2112371 at *2.

Just as in *Early*, Mr. Connolly's chronic underlying medical conditions put him in the same category that the CDC has identified for those who face a higher risk of severe illness if they contract the coronavirus. Moreover, the horrendous situation at FCI Elkton is well-documented and COVID-19 remains a very real threat to the health and safety of Mr. Connolly. As such, this Court should, too, find that extraordinary and compelling reasons exist warranting consideration of a reduction of Mr. Connolly's sentence.[36]

## VIII. Recent Northern District of Illinois Precedent Supports Granting Mr. Connolly's Motion for Compassionate Release.

While Mr. Connolly has reported to counsel that he has been prescribed medication for his chronic bronchitis, the rate of infection at FCI Elkton illustrates that it is a ticking time bomb. Even though he is relatively young, Mr. Connolly's health conditions make him particularly susceptible. Placing him in a dormitory setting where one out of every four inmates has contracted this virus does not bode well.

Additionally, Mr. Connolly's concerns are not generalized concerns of possible exposure to COVID-19. District Courts Around the Country Continue to Grant Compassionate Release on the basis of COVID-19. Mr. Connolly's chronic bronchitis and sleep apnea put him at risk of severe infection. Federal judges have

---

[36] The district court in *Early* also concluded that the defendant's sentence reduction was consistent with applicable policy statements issued by the Sentencing Commission because "[t]he policy statements issued by the Sentencing Commission even before the passage of the First Step Act included an open-ended provision broad enough to cover the circumstances argued by Mr. Early." *Id.* at *3 (citing U.S.S.G. § 1B1.13, app. note 1(D); *United States v. Reyes*, No. 04 CR 970, 2020 WL 1663129, at *2 (N.D. Ill. Apr. 3, 2020) (Leinenweber, J.)). Counsel submit this Court should, too, find.

ordered the release of hundreds of inmates from FCI Elton because of the disastrous way the virus has coursed through that facility.

Moreover, Courts in this district have granted motions for compassionate release under similar circumstances and after the exhaustion of administrative remedies. *See United States v. Lewellen*, No. 09-CR-0332-2, 2020 WL 2615762 (N.D. Ill. May 22, 2020) (defendant with severe obesity, hypertension, and a heart condition and had only completed 57.6% of his 18-year sentence for drug trafficking granted compassionate release); *United States v. Body,* No. 18 CR 503-1, 2020 WL 2745972 at *2 (N.D. Ill. May 27, 2020) (granting motion for compassionate release for a defendant who suffers from diabetes, thyroid issues, gout, arthritis, and high cholesterol, noting "[i]t was not and is not the Court's intention, in imprisoning [the defendant], to send him to his death or put him at a daily risk of serious bodily harm. That, however, is the reality that [the defendant] is facing today. Requiring him to be subjected to this severe risk for an extended period does not amount to just punishment, nor does it, in the Court's view, promote respect for the law."); *United States v. Guzman*, No. 13-CR-576-1, 2020 WL 2781713 at *1 (N.D. Ill. May 28, 2020) (granting motion for compassionate release for a defendant who had four years left to serve of his sentence upon the condition that the defendant's supervised release be modified to include home incarceration  for the remainder of his original term of incarceration). As such, precedent from this district continue to support Mr. Connelly's motion for compassionate release.

Likewise, courts from other districts have highlighted underlying chronic medical conditions as a basis for release, as well as prison conditions. *See, e.g., United States v. Martinez*, No. 1:19-cr-10348-RGS, Dkt. No. 42 (D. Mass. May 11, 2020) (releasing defendant with underlying medical issues); *United States v. Le*, Case No. 1:19-cr-10199, Dkt. No. 99 (D. Mass. May 6, 2020) (releasing defendant in light of COVID-19 even though he lacks "physical conditions that put him at high risk" from COVID-19 because "[t]he reduction in the prison population in and of itself" is important to combatting the virus); *United States v. Webb*, Case No. 7:19-cr-45, Dkt. No. 38 (M.D. Ga. May 6, 2020) (releasing defendant post-plea & presentence detained in county jail where it is "unclear" what plans have been implemented to "combat COVID-19"); *United States v. Mason*, Case No. 10-cr-625, Dkt. No. 61 (D. Md. May 4, 2020) (releasing supervisee with "extensive and serious criminal history" from custody because COVID-19 is "so contagious" making it "imperative that D.C. Jail and CTF take all reasonable steps to prevent its spread within the jails"); *United States v. Cordova*, No. 4:19-cr-40025-TSH, Dkt. No. 128 (D. Mass. May 1, 2020) (pretrial release on unsecured bond with condition of EM house arrest, where defendant had no underlying medical conditions, facing 10 year mm, career offender, and had previously agreed to voluntary detention); *United States v. Sturmer*, Case No. 8:18-cr-468, Dkt. No. 298 (D. Md. May 1, 2020) (releasing defendant post-plea & presentence whose conditions of confinement "render[] her helpless to prevent the spread in [her] surroundings of a virus that is now responsible for over sixty thousand deaths in this country"); *United States v.*

*Hernandez*, Case No. 19-CR-158, Dkt. No. 385 (D. Md. Apr. 29, 2020) (releasing defendant with history of committing new crimes while on probation in light of "COVID-19 health risks to the Defendant"); *Cruz-Berrios v. Borrero*, Case No. 3:14-cv-1232-ADC, Dkt. No. 218 (D.P.R. Apr. 28, 2020) (releasing successful habeas petitioner whose case was remanded for a new trial from custody because of his age (64) his "health complications," and "the COVID-19 pandemic"); *United States v. Parmer*, No. 18-CR-00267-RS-1, 2020 WL 2213467 (N.D. Cal. Apr. 14, 2020) (granting temporary pretrial release to 55 year old defendant with acute need to prepare for imminent trial); *United States v. Daniels*, No. 19-CR-00709-LHK (NC), 2020 WL 1815342 (N.D. Cal. Apr. 9, 2020) (granting temporary pretrial release to defendant with obesity, previous head wounds, and post-traumatic stress disorder).

## IX. Conclusion.

For the foregoing reasons, Mr. Connolly respectfully requests that the Court consider the above and grant his motion for compassionate release by reducing his sentence to time served, or in the alternative, a sentence of home incarceration for the remainder of his custody, is appropriate in this case.

.

Respectfully submitted,

s/ Michael F. Clancy

s/Patrick W. Blegen

MICHAEL F. CLANCY
53 W. Jackson Blvd., Suite 1401
Chicago, IL 60604
(312) 427-0288

BLEGEN & GARVEY
53 W. Jackson Blvd., Suite 1424
Chicago, IL 60604
(312) 957-0100