IN THE
UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) No. 15 CR 178/20 CV 01792 |
| v. | ) |
| | ) Judge Robert W. Gettleman |
| | ) Emergency Judge Martha M. Pacold |
| LAZARICK KING | ) |

**DEFENDANT LAZARICK KING'S EMERGENCY MOTION FOR
<u>COMPASSIONATE RELEASE</u>**

  Lazarick King is a 46-year old man who suffers from hypertension, for which he takes two daily medications, and asthma, for which he requires two inhalers, has daily problems breathing, and monthly chest pains. Since he has been incarcerated at FCI Ashland, he has experienced five to six asthma attacks. These two conditions put him at a high risk for serious complications or death, should he get infected with COVID-19.

  On April 17, 2020, Mr. King submitted a request to the warden of his facility asking for compassionate release, or in the alternative, home confinement. The warden denied his request on May 4, 2020. Mr. King reports that he appealed the denial of the warden's decision in approximately mid-May, which was denied.

  Because the BOP has denied Mr. King's request, and plans to keep him confined through the COVID-19 pandemic, Mr. King requests that this Court grant him compassionate release and sentence him to time served under 18 U.S.C. § 3582(c)(1)(A)(i), because his health conditions and vulnerability to COVID-19 infection are "extraordinary and compelling reasons" that support a reduction in his sentence; in the alternative, Mr. King requests that this Court order the remainder of his sentence be served on home confinement, pursuant to 18 U.S.C. §

1

3582(c)(1)(A).[1]

## BACKGROUND

**I.      Factual and Procedural History**

On March 7, 2018, Mr. King was sentenced to 84 months in prison after he pled guilty to wire fraud (Counts 1, 3), mail fraud (Counts 2, 4-7), and aggravated identity theft (Count 8). PSR at 1-2; Dkt. 67 at 3. Mr. King has been in custody for approximately 33 months. *See* Prog. Report, attached as Exh. A. After accounting for good time, Mr. King has already served approximately 46% of the sentence that this Court imposed. Mr. King has an anticipated release date of December 10, 2023. *See* https://www.bop.gov/inmateloc/.

The Court's sentence in Mr. King's case was not intended to be a death sentence. And developments since the time of sentencing—in particular, the unforeseeable COVID-19 crisis and Mr. King's health—suggest that the ends of sentencing would be best achieved by allowing Mr. King to spend the remainder of his sentence outside the confines of prison.

In considering whether to grant Mr. King compassionate release, this Court should consider the substantial progress that Mr. King has made since he committed the above-mentioned offenses. For example, Mr. King has received "satisfactory work evaluations as a commune orderly" and has taken 20 education courses, including courses related to data analysis, which he plans on using to secure work in warehousing in the future. *See* Exh. A. He has maintained a good disciplinary record, and has not received any incident reports. Mr. King's conduct while detained shows that he is committed to his own rehabilitation and that he will not pose any danger to the community if released.

---

[1] *See, e.g.*, *United States v. Zukerman*, 2020 WL 1659880, *6 (S.D.N.Y. Apr. 3, 2020) (modifying sentence "such that remaining term of imprisonment was replaced by an equal period of home incarceration").

## II. Mr. King's Release Plan

Mr. King has a release in place that will protect the community and ensure he stays safe and healthy. He plans on living with his partner, Brittini Bates, in Las Vegas, Nevada, with their three young children, ages nine (Laniya), six (Brooke), and two (Bryson). Mr. King's sister, Cat Howze, who lives in the Chicago area, can pick Mr. King up at FCI Ashland and bring him to Las Vegas. Ms. Bates works as a security guard, and is willing to provide him financial support as he plans on securing work. While she currently lives in a two-bedroom apartment, she is searching for a larger home, which will aid Mr. King in self-quarantining.

## III. Mr. King's health problems place him at high risk for severe illness or death from COVID-19.

Mr. King currently suffers from high blood pressure, for which he is on two medications, and asthma, for which he uses two inhalers. *See* Medical Records, attached as Exh. B.[2] Mr. King reports that he has experienced approximately five to six asthma attacks while incarcerated at FCI Ashland, has daily problems breathing, and has had monthly chest pain. Mr. King's health conditions significantly raise his risk of serious complications or death from COVID-19. There is a medical consensus that those suffering from hypertension and asthma are particularly vulnerable from contracting COVID-19. For example, of the COVID-19 patients in Lombardy, Italy who died in intensive care, nearly two-thirds had hypertension.[3] About half of COVID-19 patients in U.S. hospitals suffer from hypertension.[4] A Centers for Disease Control and Prevention report on U.S. Hospitalization for COVID-19 found that 49.7% of hospitalized

---

[2] While Mr. King's medical records document that he has mild, intermittent asthma and that he requires the use of one inhaler (albuterol), he has reported that he also uses another inhaler (asmanex). He has also informed counsel that he uses the albuterol inhaler twice daily, and his asmanex inhaler twice daily.

[3] Betsy McKay, *Heart Conditions Prove Especially Dangerous for COVID-19 Patients*, WALL STREET JOURNAL (Apr. 12, 2020).

[4] *Id.*

3

patients suffer form hypertension.[5] In addition the CDC has warned that individuals with "moderate to severe asthma" are at "higher risk of getting very sick from COVID-19." *Coronavirus Disease 2019 (COVID-19)*, Centers for Disease Control and Prevention, (Apr. 2, 2020), *available at* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/asthma.html.[6]

## ARGUMENT

I.  **This Court Should Grant Mr. King Compassionate Release and Reduce His Sentence to Time Served.**

In 2018, the First Step Act modified the compassionate release statute to end the BOP's gatekeeping function and to allow inmates to directly file compassionate release motions in certain circumstances. *See* 18 U.S.C. § 3582(c)(1)(A)(i). Under the First Step Act, the Court may grant an inmate's motion for a sentencing reduction if three requirements have been satisfied.

*First*, the Court must determine either that (a) the defendant "has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf" or that (b) 30 days have elapsed since the receipt of such a request by the warden of the defendant's facility. *Id.* But, as discussed further below, courts have recognized that these requirements may be waived in light of the COVID-19 emergency. *See, e.g.*, *United States v. Zuckerman,* 16-cr-194 (S.D.N.Y. April 3, 2020) ("the Court holds that [defendant]'s advanced age and compromised health, combined with the high risk of contracting COVID-19 at

---

[5] Garg S., Kim L., Whitaker M., et al., *Hospitalization Rates and Characteristics of Patients Hospitalized with Laboratory-Confirmed Coronavirus Disease 2019 – COVID-NET, 14 States, March 1-30, 2020*, MMWR Morb. Mortal Wkly. Rep. 2020; 69: 458-464 (Apr. 17, 2020), https://www.cdc.gov/mmwr/volumes/69/wr/mm6915e3.htm.

[6] While Mr. King's medical records reflect that he has mild, intermittent asthma, it is noteworthy that Mr. King has reported that he requires the use of two inhalers daily, suffers from daily problems breathing, has monthly chest pain, and has experienced five to six asthma attacks while incarcerated.

Otisville, justify waiver of the exhaustion requirement."). **Second**, the Court must determine that "extraordinary and compelling reasons warrant such a reduction . . . and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A)(i). **Third**, the Court may reduce a defendant's sentence after determining that the reduction is consistent with the sentencing factors outlined in 18 U.S.C. § 3553(a). *Id.*

### A. Mr. King Has Satisfied the Exhaustion Requirement Under § 3582

Mr. King made his compassionate release request to the warden on April 17th. The warden denied his request on May 4, 2020. *See* Request and Warden Denial, attached as Exh. C.[7] Thus, thirty days have lapsed from the receipt of the request. Accordingly, the prerequisites for filing under 18 U.S.C. § 3582(c)(1)(a) have been met and the Court should consider the motion on its merits. *See, e.g.*, *United States v. Washington*, 2:07-cr-00258-CMR, ECF 529 at 3 (E.D. Pa. May 14, 2020); *United States v. Jenkins*, 2020 WL 2466911, at *4 (D.Colo. May 8, 2020) (warden's response "matters not…because 30 days have passed [since the initial request], rendering [defendant's] Motion proper under § 3582(c)(1); *United States v. Amarrah*, 2020 WL 2220008, at *4 (May 7, 2020); *United States v. Bazzle*, 2:11-cr-00074-BMS, ECF 84 at 1 n.1 (E.D. Pa. May 5, 2020) (exhaustion where defendant provided the warden with a request for a compassionate release, which was subsequently denied); *United States v. Robinson*, 2020 WL 1982872, at *2 (N.D. Cal. Apr. 27, 2020) ("as the government concedes, 30 days have elapsed since Robinson requested relief from the Warden at Lompoc, so Robinson has satisfied the administrative exhaustion requirement"); *United States v. Spears*, 2019 WL 5190877, at *1, *3 (D.Or. Oct. 15, 2019) (motion "ripe for review' 30 days after defendant submitted his compassionate release request).

---

[7] Mr. King reports that he filed an appeal of the warden's decision and that his appeal has been denied. Counsel has made a FOIA request for these documents; due to the expedited nature of the motion, counsel can provide the Court a copy of the documents once they are received.

**B. Mr. King is eligible for compassionate release because his heightened vulnerability to COVID-19 is an extraordinary and compelling circumstance that weighs in favor of immediate release.**

In cases where the exhaustion requirement has been satisfied, the First Step Act empowered this Court to make an independent determination as to whether there are "extraordinary and compelling reasons" for compassionate release. The Court is no longer required to defer to the BOP's determination of whether such circumstances exist. *See, e.g., United States v. Ebbers*, 2020 WL 91399, at *4 n.6 (S.D.N.Y. Jan. 8, 2020) ("[T]he First Step Act reduced the BOP's control over compassionate release and vested greater discretion with courts. Deferring to the BOP would seem to frustrate that purpose."); *United States v. Cantu*, 2019 WL 2498923, at *3-4 (S.D. Tex. June 17, 2019) (same).

Rather than deferring to the BOP, the First Step Act directed courts to consider whether the reduction is "consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A)(i). As a number of courts have noted, the Sentencing Commission has not issued any applicable policy statements since the passage of the First Step Act. *See, e.g.*, *United States v. Beck*, 2019 WL 2716505, at *5–6 (M.D.N.C. June 28, 2019) ("By its terms, the old policy statement applies to motions for compassionate release filed by the BOP Director and makes no mention of motions filed by defendants."). Nevertheless, courts have found that the old policy statement provides helpful guidance in determining whether a defendant is eligible for compassionate release. *See id.*; *United States v. Ebbers*, No. S402CR11443VEC, 2020 WL 91399, at *4 (S.D.N.Y. Jan. 8, 2020).

The old policy statement issued by the Sentencing Commission listed four conditions that would constitute "extraordinary and compelling reasons" to reduce a sentence. U.S.S.G. § 1B1.13 cmt. n.1(A)-(D). While the first three conditions set out precise criteria for eligibility,

the Sentencing Commission recognized the limits of that mechanical approach and included a "catch-all" provision designed to cover "an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)." U.S.S.G. § 1B1.13 cmt. n.1(D).

Since the passage of the First Step Act, courts have found that they may rely on this "catch-all" provision to determine eligibility, even in cases where the BOP has made no determination regarding an inmate's eligibility for compassionate release. *See, e.g.*, *United States v. Reyes*, No. 04 CR 970, 2020 WL 1663129, at *2 (N.D. Ill. Apr. 3, 2020) (granting compassionate release motion under the catch-all provision in the absence of any BOP finding regarding eligibility); *United States v. Owens*, No. 97-CR-2546-CAB, ECF. 93 at 4 (S.D. Cal. Mar. 20, 2020) ("In the wake of the First Step Act, numerous courts have recognized the court can determine whether extraordinary and compelling reasons exist to modify a sentence—and may do so under the 'catch all' provision similar to that recognized in U.S.S.G. Manual § 1B1.13 n.1(D). . . .") (collecting cases); *United States v. Redd*, No. 1:97-cr-0006-AJT, 2020 WL 1248493, at *8 (E.D. Va. Mar. 16, 2020) ("[T]he Court joins other courts in concluding that a court may find, independent of any motion, determination or recommendation by the BOP Director, that extraordinary and compelling reasons exist based on facts and circumstances other than those set forth in U.S.S.G. § 1B1.13 cmt. n.1(A)-(C) . . . ."). As a result, the policy statement in the Sentencing Guidelines does not prevent this Court from making an independent determination that the COVID-19 pandemic is an extraordinary and compelling reason justifying early release.

    1. *COVID-19's rapid spread through the BOP system is an unprecedented public health crisis.*

As of June 10, 2020, more than 1.9 million in the United States had been diagnosed with

COVID-19 and more than 112,000 people have died of the disease.[8] The COVID-19 death toll includes at least 78 federal inmates. *COVID-19 Coronavirus page*, Federal Bureau of Prisons (June 10, 2020), https://www.bop.gov/coronavirus/index.jsp. The President of the United States has declared that the pandemic is a national emergency and has issued guidance advising everyone in the United States to "work or engage in schooling from home whenever possible" and to "avoid social gatherings in groups of more than 10 people."[9]

Prisons and jails are especially susceptible to the rapid spread of coronavirus. *See* Joseph A. Bick, *Infection Control in Jails and Prisons,* 45 Clinical Infectious Diseases 1047, 1055, (2007). at https://academic.oup.com/cid/article/45/8/ 1047/344842 (noting that in jails "[t]he probability of transmission of potentially pathogenic organisms is increased by crowding, delays in medical evaluation and treatment, rationed access to soap, water, and clean laundry, [and] insufficient infection-control expertise"). Despite the BOP's efforts to limit the spread of COVID-19, the virus continues to spread rapidly throughout BOP facilities. As of June 10, the BOP has confirmed that 2134 federal inmates and 190 BOP staff have tested positive for COVID-19. *COVID-19 Coronavirus page*, Federal Bureau of Prisons (June 10, 2020), https://www.bop.gov/coronavirus/index.jsp. Even these numbers are likely a drastic undercount of the extent of the infection. *Wilson v. Williams*, 20-cv-794, ECF 22 at 3 (N.D. Ohio Apr. 22, 2020) ("it is unlikely that these figures represent the actual number of cases at the institution, given the paltry number of tests the federal government has made available for the testing of Elkton's inmates")

---

[8]     *Coronavirus in the U.S.: Latest Map and Case Count*, N.Y. Times, Apr. 14, 2020, https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html.

[9]     The President's Coronavirus Guidelines for America, Mar. 16, 2020, https://www.whitehouse.gov/wp-content/uploads/2020/03/03.16.20_coronavirus-guidance_8.5x11_315PM.pdf.

8

At present, there are no confirmed coronavirus cases at FCI Ashland. But, as this Court has already noted, "the fact that there have been no confirmed cases of coronavirus diseases . . . "is not the same as saying that the institution is coronavirus-free or that there is no risk to [the defendant]." *United States v. Manning*, No. 15-cr-50007, ECF 90 at 3 (N.D. Ill. Apr. 20, 2020). A number of courts have followed suit recently. *United States v. Feucht*, No. 11-cr-60025, ECF 53 at 6 (S.D. Fla. May 28, 2020) (granting compassionate release despite no confirmed cases at FCI Jessup because "[z]ero confirmed cases is not the same thing as zero COVID-19 cases" (citation omitted)); *United States v. Atkinson*, 2020 WL 1904585, at \*\*2-4 (D. Nev. Apr. 17, 2020) (granting compassionate release to defendant Atkinson, notwithstanding that FCP Atwater where he was housed had seen no cases of COVID-19 because the realities of prison life make it impossible for medically vulnerable inmates like Mr. Atkinson to follow CDC guidelines to protect themselves in the face of COVID-19); *United States v. Amarrah*, 2020 WL 2220008 (E.D. Mich. May 7, 2020) (releasing medically vulnerable inmate from FCI Loretto, despite no reported COVID-19 cases at the facility, because he could not adequately protect himself in line with CDC guidelines); *United States v. Ben-Yhwh*, 2020 WL 1874125 (D. Haw. Apr. 13, 2020); *United States v. Asaro*, 2020 WL 1899221, at \*3 (E.D.N.Y. April 17, 2020) ("absent more information about how much testing the BOP is conducting, it is possible that undetected cases are present in the facility"); *United States v. Burrill*, 2020 WL 1846788, at \*4 (N.D. Cal., April 10, 2020) ("Prison conditions mean incarcerated individuals, as well as society as a whole, are safer the more defendants are released.").

> 2. *Given Mr. King's hypertension and asthma, this public health crisis is an extraordinary and compelling reason justifying compassionate release.*

As discussed above, Mr. King suffers from two medical conditions that make him particularly vulnerable to the disease. In comparable cases involving vulnerable defendants,

9

courts have found that the COVID-19 pandemic is an extraordinary and compelling reason justifying a sentence reduction. *See, e.g.*, *United States v. Norris*, No. 3:18-cr-243, ECF. 37 (D. Conn. Apr. 16, 2020) (granting reduction where only risk factor identified was asthma: "[Defendant] suffers from asthma and uses an Albuterol inhaler to treat his symptoms….[H]is medical condition and current conditions of confinement constitute extraordinary and compelling reasons to reduce his sentence"); *United States v. Gorai*, 2020 WL 1975372 (D. Nev. Apr. 24, 2020) (asthma); *United States v. Wen*, 2020 WL 1845104 (W.D.N.Y., Apr. 13, 2020) (asthma); *United States v. Dunlap*, 2020 WL 2062311 (M.D.N.C. Apr. 29, 2020) (hypertension); *United States v. Patterson*, 2020 WL 2217262 (D. Md. May 7, 2020) (hypertension); *United States v. Bertrand*, 2020 WL 2179387 (N.D. Fla. Apr. 29, 2020) (hypertension and asthma).

And, as great as the risk Mr. King faces would be under normal circumstances, in prison he can't practice social distancing or proper hygiene. Similarly, his ability to go to a hospital or get tested (and treated) early is curtailed by the very fact of him being in custody. Mr. King reports that at FCI Ashland that he is in an open-dorm style setting, where the beds are approximately four feet apart. He has also told counsel that he is unable to maintain six feet of distance from other prisoners throughout the day. As a result, Mr. King is at a far greater risk of death or serious injury than he would be if he were released from custody.[10] The same is true here and additional time in custody is certain to place Mr. King's health in serious jeopardy.

**III**. **The 3553(a) factors weigh in favor of Mr. King's immediate release.**

The § 3553(a) factors also weigh in favor of releasing Mr. King immediately. *See* 18 U.S.C. § 3582(c)(1)(A) (directing the court to "consider[] the sentencing factors set forth in

---

[10] *See* Centers for Disease Control, *FAQs for Administrators, Staff, Incarcerated People & Family Members*, Mar. 28, 2020, https://www.cdc.gov/ coronavirus/2019-ncov/community/correction-detention /faq.html ("People in correctional and detention facilities are at greater risk for illnesses, such as COVID-19 because of their close living arrangement with other people."

section 3553(a) to the extent that they are applicable."); *see also* U.S.S.G. § 1B1.13(2) (advisory guideline suggesting one factor weighing in favor of compassionate release is that "the defendant is not a danger to the safety of any other person or to the community").

Most significant is Mr. King's post-sentencing conduct, which "provides the most up-to-date picture of his 'history and characteristics." *See Pepper v. United States*, 562 U.S. 46 (2011) (citing 18 U.S.C § 3553(a)(1)). Since his incarceration, Mr. King has secured work within the Food Service unit of the facility, as a compound orderly, and taken part in the BOP's Unicor program, a correctional program meant to assist inmates with acquiring marketable job skills in order to contribute to society upon release. *See* Exh. A at 1. He has taken a host of education classes, including a data analysis class, called "Lean Six Sigma," which he plans on using to secure work upon release. *See* Exh. A at 1. Finally, he has completed drug abuse education, *see* Exh. A at 2, and represents that he has facilitated a volunteer group, called Smart Recovery Program, to help those with drug addictions. Other courts have considered similar accomplishments by an inmate sufficient to establish the inmate's rehabilitation, favoring a sentence reduction. *See United States v. Brown*, 2020 WL 2091802, at *7 (S.D. Iowa April 29, 2020) (finding that inmate's "rehabilitation cuts in favor of [compassionate] release" where inmate "has not had a single disciplinary incident."); *United States v. Decator*, 2020 WL 1676219, at * 4 (D. Md. April 6, 2020) (finding that Section 3553(a)(1) factor favored compassionate release because, *inter alia*, "[w]hile incarcerated, Decator has participated in extensive education and rehabilitative programming; he has participated in over 1,500 hours of programming and has completed more than 70 courses" and "has a minimal, nonviolent disciplinary record."); *United States v. Redd*, 2020 WL 1248493, at *10 (E.D. Va. Arch 16, 2020) (finding that inmate's evidence of rehabilitation favored sentence reduction because

11

inmate "has demonstrated a commitment to self-improvement, devoting hundreds of hours to vocational programs, assisting others in their rehabilitative efforts, exhibiting solid work habits, [and] caring for mental health inmates[.]"); *United States v. Perez*, 2020 WL 1180719, at *3 (D. Kan. Mar. 11, 2020) (finding that inmate's rehabilitation favored compassionate release where inmate "gained his GED while in prison and has availed himself of various educational programs.").

Especially in light of the danger Mr. King faces if he remains in custody, the 33 months he has already served are sufficient "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense" under § 3553(a)(2)(A). *See, e.g., United States v. Rodriguez*, 2020 WL 1627331, at *12 (E.D. Pa. Apr. 1, 2020) (finding § 3553(a)(2)(A) satisfied for the purposes of compassionate release after the defendant served the majority of his prison sentence). The "just punishment" factor is especially important under these highly unusual circumstances. When the Court sentenced Mr. King, surely "the Court did not intend for that sentence to 'include incurring a great and unforeseen risk of severe illness or death' brought on by a global pandemic." *United States v. Zukerman*, 2020 WL 1659880, at*6 (S.D.N.Y. Apr. 3, 2020) (granting Zukerman's compassionate release motion and modifying his sentence to home incarceration after he had served 33 months of a 70-month sentence); *see also United States v. Wurzinger*, 467 F.3d 649, 652 (7th Cir. 2006) ("There is a worthy tradition that death in prison is not to be ordered lightly, and the probability that a convict will not live out his sentence should certainly give pause to a sentencing court.").

Keeping Mr. King locked up is also not necessary "to protect the public from further crimes" under § 3553(a)(2)(C). This factor focuses specifically on Mr. King's individual risk of recidivism. The last 33 months of Mr. King's life shows that he has committed himself to

12

becoming a law-abiding citizen. In addition, regional counsel has confirmed that Mr. King's PATTERN score is low. And, while Mr. King is currently confined in a low security facility, he has been classified as a minimum-security level inmate, *see* Prog. Rep. at 1. Per his unit manager, he is currently being considered for transfer to a minimum-security prison. Moreover, Mr. King is currently incarcerated for the crimes of fraud and identity theft, non-violent offenses, and has never been convicted of a violent offense[11], reflecting that his risk of recidivism is also low. *See Recidivism Among Federal Offenders: A Comprehensive Overview*, at 20, https://sentencing.umn.edu/sites/sentencing.umn.edu/files/recidivism_among_federal_offenders_2016.pdf (among federal offenders, those convicted of fraud had lowest re-arrest rates).

Finally, it almost goes without saying that requiring Mr. King to spend the remainder of his time in custody will not provide him with "medical care . . . in the most effective manner" under § 3553(a)(2)(D). Even before the pandemic, the BOP was failing to provide adequate healthcare.[12] The situation has only worsened with the COVID-19 onslaught.[13] One recent

---

[11] *See* PSR at 10-13.

[12] *See* U.S. Dep't of Justice, *Office of the Inspector General Review of the Federal Bureau of Prison's Medical Staffing Challenges*, at i (Mar. 2016) (describing an inability to hire a sufficient number of healthcare professionals to meet the needs of a teeming incarcerated population); *see also* Erica Zunkel, *Article: 18 U.S.C. § 3553(a)'s Undervalued Sentencing Command: Providing a Federal Criminal Defendant With Rehabilitation, Training, and Treatment in "The Most Effective Manner,"* 9 Notre Dame J. Int'l & Comp. L. 49, 57–60 (2019) (detailing the BOP's systematic failure to procure healthcare for inmates).

[13] *See* Lisa Freeland et al, *We'll See Many More COVID-19 Deaths in Prison if Congress and Barr Don't Act Now*, WASH. POST (Apr. 6, 2020), https://www.washingtonpost.com/opinions/2020/04/06/covid-19s-threat-prisons-argues-releasing-at-risk-offenders ("Numerous credible public-health experts have observed that overcrowded prisons with communal living; shared toilets, showers, and sinks; poor sanitation; and wholly inadequate medical care would allow covid-19 to sweep through the prison population far more quickly than the general public — with devastating consequences."); *see also* Joe Davidson, *Unions for Prison, VA Workers File "Imminent Danger" Reports about Coronavirus Conditions*, WASH. POST (Apr. 9, 2020), https://www.washingtonpost.com/politics/unions-for-prison-va-workers-file-imminent-danger-reports-about-coronavirus-conditions/2020/04/08/78962ea0-79e4-11ea-8cec-530b4044a458_story.html.

district court judge weighed this factor in granting compassionate release to an elderly defendant with underlying conditions, concluding that the defendant was "unlikely to be able to get the medical care he needs in the midst of an ongoing pandemic." *United States v. Burrill*, 2020 WL 1846788, at *3 (N.D. Cal. Apr. 10, 2020). For these reasons, living in his partner's home would dramatically reduce Mr. King's risk of infection due to COVID-19 and would set up him for success as he reenters society.

## Conclusion

For the foregoing reasons, Mr. King respectfully requests that the Court modify his sentence under 18 U.S.C. § 3582(c)(1)(A)(i) to time served. In the alternative, Mr. King respectfully requests that this Court order the remainder of his sentence be served on home confinement.

                                                          Respectfully submitted,

                                                          FEDERAL DEFENDER PROGRAM
                                                          John F. Murphy
                                                          Executive Director

By:     /s/ *William Hardwicke*
           William Hardwicke
           Attorney for Lazarick King


FEDERAL DEFENDER PROGRAM
55 E. Monroe Street, Suite 2800
Chicago, Illinois  60603
(312) 621-8300

## CERTIFICATE OF SERVICE

The undersigned, <u>William Hardwicke</u>, an attorney with the Federal Defender Program, hereby certifies that in accordance with FED. R. CRIM. P. 49, FED. R. CIV. P. 5, L. R. 5.5, and the General Order on Electronic Case Filing (ECF), the following document(s):

**DEFENDANT LAZARICK KING'S EMERGENCY MOTION FOR COMPASSIONATE RELEASE**

was served pursuant to the district court's ECF system as to ECF filings, if any, and were sent by first-class mail/hand delivery on <u>June 11, 2020</u>, to counsel/parties that are non-ECF filers.

By: */s/ William Hardwicke*
William Hardwicke
Federal Defender Program
55 East Monroe Street, Suite 2800
Chicago, IL 60603
(312) 621-8300