**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 16 CR 839 |
| | ) | Hon. Judge Gary Feinerman |
| RICHARD BOOY, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT RICHARD BOOY'S EMERGENCY**
**MOTION FOR COMPASSIONATE RELEASE OR HOME CONFINEMENT**

Now comes the Defendant, **Mr. Richard Booy**, by and through his attorney, Stephen F. Hall, and respectfully requests that this Honorable Court grant his request for compassionate release, or in the alternative recommend to the Bureau of Prisons ("BOP") that he serve the remainder of his sentence on home confinement. Mr. Booy makes this request pursuant to 18 U.S.C. §§ 3582(c)(1)(A) and 3621(b)(4), as well as § 12003(b)(2) of the CARES Act. In support thereof, Mr. Booy states as follows:

### I.    INTRODUCTION

There are extraordinary and compelling reasons to grant Mr. Booy compassionate release based on his serious health conditions and the risk that treatment of those conditions pose to inmates around Mr. Booy should he contract COVID-19. Mr. Booy suffers from obstructive sleep apnea ("OAS") which causes repeated, interrupted breathing during sleep. He also suffers from Stage 2 hypertension. Mr. Booy's hypertension is not being treated by the BOP whether through medication, dietary restrictions, or otherwise. Mr. Booy's OAS is being treated through the use of a continuous positive airway pressure ("CPAP") machine, which is known to increase the risk of spreading COVID-19 by potentially spreading the virus to those around him.

Should Mr. Booy become sick with COVID-19, he runs a substantial risk of severe illness based on his hypertension and OAS, while also posing an increased risk to those around him. All of these issues are discussed below; however, the conclusion is clear: the BOP cannot safeguard Mr. Booy from substantial illness should he contract COVID-19 nor can the BOP safeguard those around him. To prevent Mr. Booy's sentence for fraud from turning into a death sentence for him and for the staff and inmates of USP Marion, he respectfully requests that this Court enter an order reducing his sentence to time-served under the compassionate release statute.

## II.    BACKGROUND

### a.    Factual and Procedural History

On January 19, 2017, the Special July 2016 Grand Jury charged Mr. Booy with three counts of fraud in violation of 18 U.S.C. § 1341. Dkt. No. 12. This Court granted Mr. Booy's request for pretrial release with conditions during the pendency of his case. Dkt. Nos. 6, 7. After approximately one-and-a-half years on pretrial release, Mr. Booy pleaded guilty by plea declaration to Count One of the Indictment on July 26, 2018. Dkt. No. 62.

Through his declaration, Mr. Booy admitted that beginning on or about August 2012 and continuing until December, 2016, he engaged in a mail fraud scheme designed to obtain money from his clients through false statements and fraudulent pretenses, representations, and promises. Dkt. No. 62, p. 2. More specifically, Mr. Booy owned and operated Safe Financial Strategies, LLC and Principal Financial Strategies, LLC. Through his businesses, Mr. Booy falsely represented to his clients that their money would be placed in a no-risk investment, including one-year term certificates of deposit with a guaranteed return on the investors' principal amounts. *Id.* Instead of investing that money as promised, Mr. Booy fraudulently misappropriated a majority of the funds into his bank accounts for his own personal use and benefit. *Id.* For example, on August 4, 2015, investor R.O. gave Mr. Booy an $80,000 check after Mr. Booy promised to invest R.O.'s money in no-risk

2

private funds with a guaranteed 5% rate of return. *Id.* Rather than invest R.O.'s money as promised, Mr. Booy deposited R.O.'s check into Mr. Booy's own bank account and then spent the money for his own benefit. *Id.*

Mr. Booy also defrauded victims through solicitations for customers to purchase life insurance using Mr. Booy's services – including through Mr. Booy's company, Safe Financial Strategies, LLC. Rather than use all of the customers' money to purchase insurance as Mr. Booy promised, he misappropriated some of the customers' money and used it either for his own benefit or to issue refunds to other customers. Dkt. No. 62, p. 3. For example, between August 31, 2012 and January 28, 2013, Mr. Booy received at least $285,000 from customer E.Y. *Id.* Part of these funds were represented by E.Y.'s October 1, 2012 check to Mr. Booy, which was intended for the purchase of life insurance in the amount of $150,000. *Id.* Rather than use E.Y.'s money as promised for insurance and investment purposes, Mr. Booy kept a majority of the money to benefit himself and others. *Id.* E.Y. was paid back at least $285,000 out of funds borrowed from Mr. Booy's family. *Id.*

On March 18, 2019, this Court sentenced Mr. Booy to 60 months' imprisonment, with a self-surrender date of August 6, 2019. Dkt. No. 90, pp. 1, 2. This Court also ordered that Mr. Booy complete a three-year term of Mandatory Supervised Release ("MSR") upon his release from the custody of the BOP, and that Mr. Booy pay restitution of $1,439,677.94. *Id.* at 3, 7. Following sentencing, Mr. Booy remained out of custody. After this Court granted multiple requests for extensions of time, Mr. Booy ultimately surrendered to the BOP at USP Marion (Camp), in Marion, Illinois on January 16, 2020.

To date, Mr. Booy has served only five months' of his prison term. Per the BOP, Mr. Booy has approximately 42 months' remaining before his projected release date of April 24, 2024. During his incarceration, Mr. Booy has been diagnosed with OAS, and medical records reflect significant

hypertension, but do not reflect any formal diagnosis or treatment. *See* Booy Medical Records, attached hereto as Exhibit A, under seal. On April 23, 2020, Mr. Booy sent a request to the Warden of his facility seeking compassionate release pursuant to 18 U.S.C. § 3582, citing various health issues and the current pandemic, as well as a release plan. *See* Compassionate Release Request, attached hereto as Exhibit B. To date, the Warden has not responded to Mr. Booy's request.

### b. Mr. Booy's Release Plan

As explained in his request to the Warden, Mr. Booy proposes that he will reside with his sister, Sally Booy, at her home in Libertyville, Illinois. Ex. B; *see also*, Letter of Sally Booy, attached hereto as Exhibit C.[1] Mr. Booy would receive financial support from his sisters, Sally Booy and Susan Ensley. *Id.* His sisters would be able to purchase medical insurance for Mr. Booy, which would allow him to receive the physical and mental health treatment that he needs. Ms. Booy has the space at her home as well as the resources to support Mr. Booy should his request for compassionate release be granted, considering that he still would have a three-year term of MSR to serve - which this Court may modify to include home detention. Mr. Booy would also have the financial support of his parents who also reside in Libertyville, Illinois.

Releasing Mr. Booy to live with his sister would promote Mr. Booy's safety and that of the community, as it would allow for Mr. Booy to self-quarantine and practice social distancing while still having access to the care he needs for his serious medical conditions. If released, Mr. Booy would have his own space at night which would allow him to use his CPAP machine without fear of exposing anyone else to increased risk of COVID-19 infection should he be a carrier or become ill.

---

[1] Personally identifying information has been redacted from the Letter of Sally Booy. Counsel can provide an unredacted copy of Ms. Booy's letter upon request.

### c. Mr. Booy's Serious Underlying Health Issues Put Him at a Significantly Higher Risk for Severe Illness or Serious Complications Due to COVID-19

Mr. Booy's health conditions significantly increase his risk of dying or suffering serious and life-threatening complications if he contracts COVID-19. To date, hypertension is a well-defined comorbidity with COVID-19. As the pandemic continues and more data becomes available, there have been several studies which show a correlation between those who become seriously ill with COVID-19 and those that suffer from OSA – levels much higher than the known correlation between COVID-19 and asthma. In a unique situation, the treatment for OSA (using a CPAP machine) can cause greater risk to those around Mr. Booy when using the machine by spreading the virus if he is a carrier. Lastly, although the CDC notes that age alone becomes a risk factor after 65, others set the threshold much lower at only 50. *See* Declaration of Mark Stern, *United States v. Segal*, Case No. 18 CR 733 (N.D. Ill.) Dkt. 42, ¶ 5 (also attached hereto as Exhibit D) ("Vulnerable people over the age of 50, and those of any age with underlying health problems such as … weakened immune systems, hypertension, diabetes, blood, lung, kidney, heart, and liver disease ….").

People like Mr. Booy who are in this vulnerable group can experience grave respiratory illness and even organ damage if they contract COVID-19. This, in turn, "requires significant advanced support, including ventilator assistance for respiration and intensive care support" and "could put significant pressure on or exceed the capacity of local health infrastructure." Ex. D, ¶ 6. This stress would simply be too much for the BOP medical system that is already not providing adequate care to Mr. Booy. Mr. Booy's most pressing risk factors are discussed below.

**Hypertension**

"Patients with raised blood pressure have a two-fold increased risk of dying from the coronavirus COVID-19 compared to patients without high blood pressure," according to new research published earlier this month in the *European Heart Journal*.[2]  In addition to finding this two-fold increased risk of death, the researchers' analysis of 2,866 patients revealed that "patients with high blood pressure who were not taking medication to control the condition were at even greater risk of dying from COVID-19."[3]  The researchers examined data from patients admitted to Huo Shen Shan hospital in Wuhan, China between February 5 and March 15, 2020.[4]  The hospital was used exclusively to treat coronavirus patients, and the outcome of the study is significant for those suffering from hypertension.

Of those admitted to the hospital within the scope of the study, 850 had a medical history of high blood pressure.[5]  Of those 850 patients previously diagnosed with hypertension when admitted for COVID-19, 34 (4.0%) died compared to the only 22 of 2,027 (1.1%) in the non-hypertensive group.[6]  Even after adjusting for variables which may have impacted results and with a 95% confidence interval, the study still showed a two-fold increase in death among patients with hypertension when compared to those without.[7]

Of serious concern for Mr. Booy is the rate of death for those patients whose hypertension was not being treated.  "For the patients with hypertension, those without antihypertensive

---

[2] European Society of Cardiology, Press Release, *High Blood Pressure Linked to Increased Risk of Dying from COVID-19*, June 5, 2020, available at https://www.escardio.org/The-ESC/Press-Office/Press-releases/High-blood-pressure-linked-to-increased-risk-of-dying-from-COVID-19 (last accessed June 13, 2020); citing Chao Gao, *et al.*, *Association of hypertension and antihypertensive treatment with COVID-19 mortality: a retrospective observational study*, European Heart Journal, Volume 41, Issue 22, June 7, 2020, available at https://doi.org/10.1093/eurheartj/ehaa433 (last accessed June 13, 2020).
[3] *Id.*
[4] *Id.*
[5] C. Gao, *et al.*, (note 1, *supra*) at 2060.
[6] *Id.* at 2062.
[7] *Id.*

treatment (11/140) had a significantly higher rate of mortality compared with those with antihypertensive (23/710) treatments (7.9% vs. 3.2% ….)"[8] After adjusting for variables and with a 95% confidence interval, "the risk of mortality was still higher in patients without antihypertensive treatment …."[9] The results of this study are in line with other studies which reflect hypertension as the most common (30%) comorbidity in COVID-19 patients.[10]

Since arriving at USP Marion, medical staff have tested Mr. Booy's blood pressure ("BP") on three occasions. Ex. A, p. 34. Specifically, Mr. Booy's BP on January 16, January 22, and January 31, 2020 was 142/96, 130/85, 136/92, respectively. *Id.* Diagnosing high BP generally amounts to examining an average of more than two BP readings.[11] "Normal BP is defined as <120/<80 mm Hg; elevated BP 120-129/<80 mm Hg; hypertension stage 1 is 130-139 or **80-89 mm Hg, and hypertension stage 2 is ≥140 or ≥90 mm Hg.**"[12] Mr. Booy's three BP readings provide an average BP of 136/91, placing him firmly in the category of Stage 2 hypertension. A review of Mr. Booy's medical records demonstrate and discussions with Mr. Booy confirm that he is not receiving any treatment for his serious hypertension while at the BOP. The undersigned also conferred with Mr.

---

[8] *Id.*

[9] *Id.*

[10] Ernesto L. Schiffrin, *et al.*, *Hypertension and COVID-19*, American Journal of Hypertension, Volume 33, Issue 5, May 2020, available at https://academic.oup.com/ajh/article/33/5/373/5816609 (last accessed June 13, 2020), citing Fei Zhou, *et al.*, *Clinical course and risk factors for mortality of adult inpatients with COVID-19 in Wuhan, China: a retrospective study*, The Lancet, Volume 395, Issue 10229, March 11, 2020, available at https://www.thelancet.com/journals/lancet/article/PIIS0140-6736(20)30566-3/fulltext (last accessed June 13, 2020).

[11] Melvyn Rubenfire MD, *2017 Guideline for High Blood Pressure in Adults*, American College of Cardiology, May 7, 2018 ("Prior to labeling a person with hypertension, it is important to use an average based on ≥ 2 readings obtained on ≥ 2 occasions to estimate the individual's level of BP"), citing PK Whelton, *et al.*, *Guideline for the Prevention, Detection, Evaluation, and Management of High Blood Pressure in Adults: A Report of The American College of Cardiology/American Heart Association Task Force on Clinical Practical Guidelines*, J. Am. Coll. Cardiology, Volume 71, Issue 19, May 2018, available at https://www.onlinejacc.org/content/71/19/e127?_ga=2.63391983.1362203860.1591816658-1177616267.1591816658 (last accessed June 13, 2020).

[12] *Id.*; *see also* Centers for Disease Control and Prevention, *High Blood Pressure*, available at https://www.cdc.gov/bloodpressure/facts.htm (last accessed June 13, 2020).

Booy's family and discovered that there is a family history of high BP (sister, father, aunt (mother's side)).

**Obstructive Sleep Apnea**

On January 28, 2020, Mr. Booy reported to BOP Health Services complaining that, per his cellmates, he stops breathing at night, snores excessively loud, and wakes up gasping for breath. Ex. A, pp. 9, 11. Health Services ordered a sleep study which Mr. Booy completed, and the results were evaluated on February 27, 2020. Ex. A, pp. 52-53. In summary, Health Services diagnosed Mr. Booy with moderate OSA (*Id.* at 53) but was not provided with a CPAP machine until May 19, 2020 to help alleviate his symptoms. *Id.* at 51. OSA "occurs when a person'[s] airway repeatedly becomes blocked despite efforts to breathe …."[13] Although the Centers for Disease Control and Prevention ("CDC") has not added OSA to the list of known comorbidities with COVID-19, several recent studies show that the correlation between OSA and COVID-19 resulting in severe illness and death is substantially higher than the correlation between COVID-19 and asthma – a known comorbidity.[14]

In the first of the three studies, researchers identified patients from nine Seattle-area hospitals who were admitted to the intensive care unit ("ICU") with confirmed COVID-19 infections between February 24 and March 9, 2020.[15] The data sample consisted of 24 patients. "As

---

[13] Division of Sleep Medicine at Harvard Medical School, *Apnea*, available at http://healthysleep.med.harvard.edu/sleep-apnea/what-is-osa/what-happens (last accessed June 13, 2020).
[14] *See* Pavan Bhatraju, M.D., *et al.*, *Covid-19 in Critically Ill Patients in the Seattle Region – Case Series*, N. Engl. J. Med 2020, 382:2012-22, March 30, 2020, available at https://www.nejm.org/doi/full/10.1056/NEJMoa2004500 (last accessed June 13, 2020); Matt Arentz, M.D., *et al.*, *Characteristics and Outcomes of 21 Critically Ill Patients with COVID-19 in Washington State*, Journal of the American Medical Association, Volume 323, Number 16, April 28, 2020, available at https://jamanetwork.com/journals/jama/fullarticle/2763485 (last accessed June 13, 2020); Thijs Feuth, *et al.*, *Is sleep apnea a risk factor for COVID-19? Findings from a retrospective cohort study*, MedRxiv, May 18, 2020, available at https://www.medrxiv.org/content/10.1101/2020.05.14.20098319v1 (last accessed June 13, 2020) (of note, this study is a preprint that is awaiting peer-review).
[15] Pavan Khatraju, *et al.*, at 2012, 2013.

of March 23, of the 24 patients, 12 (50%) had died, 4 (17%) had been discharged from the ICU but remained in the hospital, 3 (13%) were receiving mechanical ventilation and were still in the ICU, and 5 (21%) had been discharged from the hospital."[16] Many of these patients had prior diagnoses for other chronic conditions, with the highest correlation being diabetes mellitus found in 14 (58%) of the patients.[17] The next highest correlation was a tie between chronic kidney disease (5 patients (21%)) and OSA (5 patients (21%)).[18] Only 3 (14%) suffered from asthma and only one person had chronic obstructive pulmonary disease ("COPD").[19]

While the Seattle-area study represented a small sample size, the finding that there is a stronger correlation between severe illness due to COVID-19 and OSA when compared to asthma or other lung conditions is not unique to this study. *See* Matt Arentz, *et al.*, p. 8, n. 12, *supra* (in a study of 21 different, critically ill patients admitted to the ICU at Evergreen Hospital in Washington, only 2 (9.1%) had previously been diagnosed with asthma, while 6 (28.6%) had been diagnosed with OSA, and 11 of the 21 patients (52.4%) died); Thijs Feuth, *et al.*, p. 8, n. 12, *supra* (in a study of 28 patients admitted to Turku University Hospital in southwest Finland, 29% had pre-existing OSA, "none of them having severe OSA," compared with 14% having asthma and 7% having COPD). Thus, while the CDC has previously recognized asthma as a comorbidity of COVID-19, emerging research indicates that OSA has a significantly stronger correlation to severe illness if the patient contracts COVID-19.

---

[16] *Id.* at 2015.
[17] *Id.* at 2016, Table 1.
[18] *Id.*
[19] *Id.*

### Use of CPAP Machine

After initially complaining of his sleep issues, the BOP Health Services conducted a one-night sleep study on Mr. Booy.  Analysis of the sleep study results showed that Mr. Booy's baseline blood oxygen saturation was 96.6%.  Ex. A, p. 52. During sleep, however, Mr. Booy experienced approximately 27.4 apneas and hypopneas per hour, resulting in lowered oxygen saturation for significant periods of time: "[t]he patient spent 20.4 minutes at an oxygen saturation less than 90%, and 8.9 minutes less than 85%.  The desaturation index was 24.9 events per hour sleep time.  The lowest saturation was 71.6%."  *Id.*  As a result, Health Services ordered a CPAP machine for Mr. Booy.

"A CPAP machine uses a hose and mask or nosepiece to deliver constant and steady air pressure," which helps prevent blocking of the airway associated with OSA.[20] In a recent NPR story considering the use of CPAP machines as ventilator alternatives in areas plagued with shortages, the authors cautioned:

> While that measure could stretch the supply of ventilators and save lives, it has a major drawback. Officials and scientists have known for years that when used with a face mask, such alternative devices can possibly increase the spread of infectious disease by aerosolizing the virus, whether used in the hospital or at home.
>
> ***
>
> The American Society of Anesthesiologists issued guidance on Feb. 23 discouraging CPAP use in COVID-19 patients – advice largely informed by experience with the SARS epidemic in 2003.  Studies dating to 2003 suggest that such devices can pump viruses into the air, potentially increasing the spread of a contagious disease.

Markian Hawryluck, *CPAP Machines Were Seen As Ventilator Alternatives, But Could Spread COVID-19*, NPR, March 27, 2020, available at https://www.npr.org/sections/health-shots/2020 /03/27/822211604/cpap-machines-were-seen-as-ventilator-alternatives-but-could-spread-covid-19

---

[20] Mayo Clinic, *CPAP machines: Tips for avoiding 10 common problems*, available at https://www.mayoclinic.org/diseases-conditions/sleep-apnea/in-depth/cpap/art-20044164 (last accessed June 13, 2020).

(last accessed June 13, 2020). For those that use CPAP machines, Dr. Christopher Winter, a sleep medicine specialist in Charlottesville, Virginia, cautions that "[a]nybody who uses a CPAP machine at home … may want to sleep in a separate room from loved ones to avoid infecting them. That's true even if the person with apnea doesn't have any COVID-19 symptoms."[21] *Id.* Mr. Booy continues to use his CPAP machine in his dorm-style sleeping area shared by nine other inmates, in order to lessen the effects of his OSA.

## III.   ARGUMENT

This Court can and should act quickly to release Mr. Booy. The combination of his underlying health conditions and his current housing situation put him at a higher risk for death or serious complications from COVID-19. Mr. Booy has admittedly only completed a small portion of his sentence; however, that sentence was for a non-violent crime. Mr. Booy poses no danger to the public, and permitting him to self-quarantine and socially distance at his sister's home is the safest option for him. Equally as important, granting Mr. Booy's request for compassionate release will help protect his fellow inmates and the staff at the USP Marion camp should Mr. Booy contract COVID-19.

After a sentence is imposed, a court may not modify the sentence except, as is relevant here, when extraordinary and compelling reasons warrant such a reduction. 18 U.S.C. § 3582(c)(1)(A)(i). The First Step Act expanded one of the exceptions under § 3582(c), and now allows this Court jurisdiction in certain circumstances. Section 3582(c)(1)(A) provides:

> [T]he court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to being a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of

---

[21] It is worth noting that counsel confirmed with Mr. Booy that he is using a nose-piece rather than a full mask, as is explicitly referred to in the cited NPR story. It is unclear what effect the nose-piece has when compared with a full mask in terms of potentially spreading a virus.

the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that –

    (i)       extraordinary and compelling reasons warrant such a reduction;

…

and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission.

*Id.* Thus, a defendant may now make a motion after the exhaustion of administrative remedies *or* the lapse of the 30-day waiting period. As the court recently explained in *United States v. Segal*, "[a] judge considering a motion for a reduced sentence under the First Step Act is faced with two questions. First, may the court reduce the sentence? And second, should the court reduce the sentence?" Case No. 18 CR 733, Dkt. No. 49 (N.D. Ill. May 7, 2020), citing *United States v. Shaw*, Case No. 19-2067 2020 WL 2029258, at *1 (7th Cir. Apr. 28, 2020) (considering § 404(a) of the First Step Act, which like the amendments to § 3582(c) confers discretion to reduce certain sentences). Here, the answer to both questions is yes.

### a. Mr. Booy has Satisfied the 30-Day Waiting Period

Mr. Booy submitted his request for compassionate release to the Warden of his facility on April 23, 2020. To date, Mr. Booy has not received a response from the Warden, and the 30-day period lapsed on May 25, 2020. Because more than thirty days has no run, Mr. Booy has satisfied one of the two, alternative statutory prerequisites for seeking relief, and this Court has jurisdiction to determine the matter. *See United States v. Ginsberg*, Case No. 14 CR 462, 2020 WL 2494643, *2 (N.D. Ill. May 14, 2020).

     b.  **There are Extraordinary and Compelling Reasons to Grant Mr. Booy's Request for Compassionate Release**

       i.  **Mr. Booy has a heightened risk of severe illness should he become infected with COVID-19**

As discussed above, Mr. Booy's conditions of hypertension and OSA make him more vulnerable to severe illness if he contracts COVID-19. But Mr. Booy's treatment of his OSA through the use of a CPAP machine subject those who sleep around him in his dorm-style accommodations to a higher risk of infection. The CPAP machine's use of positive pressure causes the body to expel its breath and anything traveling in that breath further than if the body were simply breathing on its own. In a dorm style setting, there is no obvious remedy to this problem. Mr. Booy needs the CPAP machine so he continues to breathe during the night, thus he cannot cease its use. Additionally, Mr. Booy's serious hypertension continues to go entirely untreated. This combination of medical conditions and lack of treatment in light of the COVID-19 pandemic amount to extraordinary and compelling reasons to granting compassionate release.

      ii.  **COVID-19's rapid spread through the BOP system represents an unprecedented public health crisis which the BOP is struggling to contain**

As of June 15, 2020, the CDC reports that 2,085,769 people in the United States have contracted COVID-19 – which is an increase of 21,957 new cases since June 14, 2020.[22] Of the more than two million cases in the United States, 115,644 have died as of June 15, 2020 – an increase of 373 deaths from the prior day.[23] The COVID-19 death toll includes at least 84 federal inmates in BOP custody (and one staff member), out of 6,141 inmates who tested positive for the

---

[22] *Coronavirus Disease 2019 (COVID-19): Cases in the U.S.*, Centers for Disease Control and Prevention, available at https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html, (last accessed June 15, 2020).
[23] *Id.*

virus.[24]  This Court is well aware of the dangers of the virus and the need to practice good hygiene, social distancing, and avoid enclosed areas large groups of people.

Prisons and jails are especially susceptible to the rapid spread of COVID-19.  "The risk posed by infectious diseases in jails and prisons is significantly higher than in the community, both in terms of transmission, exposure, and harm to individuals who become infected."  *See* Stern Declaration, ¶ 7; *see also* Joseph A. Bick, *Infection Control in Jails and Prisons*, 45 Clinical Infectious Diseases 1047, 1055 (2007) (noting that in jails, "[t]he probability of transmission of potentially pathogenic organisms is increased by crowding, delays in medical evaluation and treatment, rationed access to soap, water, and clean laundry, [and] insufficient infection-control expertise,").  Simply put, when COVID-19 hits prisons, it hits harder.[25]

Unsurprisingly, COVID-19 has spread like wildfire in prisons.  Previous reporting showed that the number of confirmed COVID-19 cases within the BOP was increasing at a rate that is 33 times faster than the rest of the country.[26]  Even those numbers likely represent a significant undercounting.  *See Wilson v. Williams*, 20 CV 794, Dkt. No. 22, at 3 (N.D. Ohio Apr. 22, 2020) ("it is

---

[24] *COVID-19 Coronavirus*, Federal Bureau of Prisons, available at https://www.bop.gov/coronavirus/, (last accessed June 15, 2020) (As of June 15, 2020, 1,324 inmates and 160 BOP staff have the virus, with an additional 4,817 inmates and 497 who have recovered from their infection).

[25] Seventy-eight percent of the inmates at the Marion Correctional Institution in Marion County, Ohio have tested positive for COVID-19.  *Ohio Began Mass Testing Incarcerated People for COVID-19. The Results Paint a Bleak Picture for the U.S. Prison System*, Time Magazine, Apr. 22, 2020, available at https://time.com/5825030/ohio-began-mass-testing-incarcerated-people-for-covid-19-the-results-paint-a-bleak-picture-for-the-u-s-prison-system/, (last accessed June 15, 2020); One-third of the prisoners at the Cummins Unit in Arkansas have tested positive for the virus – and disturbingly, most have been asymptomatic.  Andrew DeMillo, *Arkansas reports 250 more coronavirus cases at state prison*, Associated Press, Apr. 20, 2020, available at https://apnews.com/6e6c948153679922f8e4bd6305712909, (last accessed June 15, 2020); the COVID-19 infection rate at Riker's Island in New York City is 8.52% - over 15 times higher than the infection rate in the United States more broadly, which is 0.56%.  *COVID-19 Infection Tracking in NYC Jails*, The Legal Aid Society, June 5, 2020, available at https://legalaidnyc.org/covid-19-infection-tracking-in-nyc-jails/, (last accessed June 15, 2020); At a North Carolina prison near Raleigh, officials tested 700 prisoners, with 444 inmates testing positive and more than 90% of the new cases were asymptomatic.  Kevin Johnson, *Mass virus testing in state prison reveals asymptomatic infections; feds join effort*, Apr. 25, 2020.

[26] *Percentage of Increase of Infected BOP People (Inmate and Staff) Since 3/20/2020*, Federal Defenders of New York, Apr. 27, 2020, available at https://federaldefendersny.org/.

unlikely that these figures represent the actual number of cases at the institution, given the paltry number of tests the federal government has made available for the testing of Elkton's inmates").[27] The BOP's statistics are limited to confirmed cases of coronavirus cases, not those who are untested but symptomatic and in isolation.[28] In a letter to Department of Justice Inspector General Michael Horowitz, who has opened an investigation into the BOP's handling of COVID-19, Senators Dick Durbin and Chuck Grassley wrote that they "worry that the BOP is significantly underestimating the rate of COVID-19 infection in BOP facilities because the BOP has not yet conducted the number of tests on staff or inmates appropriate for facilities where a highly contagious virus can easily spread."[29] The Senators concluded by asking IG Horowitz to investigate whether BOP's official reporting "has accurately and adequately informed Congress and the public on the scope of the threat and the authorities and resources needed to combat it."[30] Additionally, until April 21, the BOP was not reporting cases at private facilities.[31]

As of June 15, 2020, the BOP reports that there is one staff member at USP Marion currently infected by COVID-19, but there are no inmate infections. Mr. Booy has not been tested and represents that there has been no testing, that he has seen, taking place at USP Marion. If there is no testing, then of course there cannot be any confirmed cases of inmate infection. But setting

---

[27] Josh Gerstein, *Feds again shift guidance on prisoner releases due to Coronavirus*, Politico (Apr. 23, 2020) available at https://www.politico.com/news/2020/04/23/coronavirus-prisons-206155 (last accessed June 15, 2020) (citing a letter from the wardens of MCC New York and MDC Brooklyn in which they admit that they have only tested 19 people between their two facilities, with 11 of those tests coming back positive).
[28] *See COVID-19 Coronavirus*, n. 18, *supra*, ("the positive test numbers are based on the most recently available **confirmed lab results** involving open cases from across the agency as reported by the BOP's Office of Occupational Health and Safety," (emphasis in original).
[29] Dick Durbin, United States Senator Illinois, *Durbin, Grassley Press DOJ IG to Review Implementation of First Step Act & CARES Act in BOP COVID-19 Investigation*, Apr. 24, 2020, available at https://www.grassley.senate.gov/news/news-releases/durbin-grassley-press-doj-ig-review-implementation-first-step-act-cares-act-bop, (last accessed June 15, 2020).
[30] *Id.*
[31] Dan Kane, *Federal officials say they will begin reporting coronavirus cases in private prisons*, The News & Observer (Apr. 21, 2020), available at https://www.newsobserver.com/news/local/article242181266.html, (last accessed June 15, 2020).

that aside, a staff member becoming ill with coronavirus is equally concerning as an inmate falling ill. After all, the most likely way for the virus to make its way into any prison is through transferred prisoners or staff who come and go from the prison in accordance with their shifts. "The boundaries between communities and correctional institutions are porous, as are the borders between countries … Despite security at nearly every nation's border, Covid-19 has appeared in practically all countries. We can't expect to find sturdier barriers between correctional institutions and their surrounding communities [.]"[32]

In *Ginsberg*, the court through Judge Matthew Kennelly, explained some of the difficulties facing an inmate at an institution with no confirmed cases of coronavirus among inmates or staff. Case No. 14 CR 462, Dkt. 181, pp. 4-5. Judge Kennelly commented:

> … the fact that there are no confirmed cases does not mean that no one in the prison has contracted coronavirus. If and when that happens, the virus is likely to spread more quickly there than in the general population due to, among other things, the difficulty of accomplishing social distancing in a prison environment and the constant influx of people coming and going from outside the prison, including correctional staff. (This is particularly true in [Defendant's] situation, as it appears he is housed in a so-called "dormitory" unit that has several dozen prisoners sleeping in the same room.)

*Id.* Mr. Booy is in much the same situation. The facility at USP Marion in which Mr. Booy is housed is dormitory style, and he is unable to practice social distancing. At night, he sleeps in a cubicle-style room with nine fellow inmates (approximately three feet apart), which is only separated from other inmates by a partial wall. During the day, the inmates are shoulder-to-shoulder while in line for count or meals. Although masks have been provided, according to Mr. Booy, many people in the facility only wear them intermittently. No hand sanitizer has been provided to the inmates. This is the kind of environment where, as documented above, any disease as contagious as COVID-19 will rapidly spread – if it has not already.

---

[32] Matthew J. Akiyama, M.D., et al., *Flattening the Curve for Incarcerated Populations – Covid-19 in Jails and Prisons*, New England Journal of Medicine (Apr. 9, 2020), available at https://www.nejm.org/doi/full/10.1056/NEJMp2005687 (last accessed May 8, 2020).

### iii. Mr. Booy's medical issues are not well managed at USP Marion, and he is not receiving appropriate medical care

Courts in this district have generally held that release is likely unwarranted where a defendant's medical condition is well-managed by a facility that has not experienced an outbreak. *See, e.g., United States v. Vazquez*, Case No. 20 CV 1792, Dkt. 947 (defendant's motion for release pending sentencing on the basis of COVID-19 was denied where "[w]hatever the circumstances may be at BOP facilities across the nation, the medical records submitted by the government satisfy the court the [the defendant] himself is in no current distress or danger and is receiving what appears to be effective care at MCC,"); *United States v. Brannon*, Case No. 20 CV 1792, Dkt. 948 (the defendant's request for release was denied where a "[r]eview of his medical records satisfies the court that [the defendant's] asthma condition is well-controlled and that he is in no need of medical treatment that is not being provided within the MCC,").  Unlike inmates at the MCC, Mr. Booy's underlying medical conditions are not well-managed at USP Marion.

Mr. Booy suffers from Stage 2 hypertension and OSA.  As explained above, Mr. Booy's hypertension places Mr. Booy in a much higher risk category for complications as a result of contracting COVID-19.  *See* pp. 6-8, *supra*; *see also United States v. Rahim*, Case No. 16 CR 20433, 2020 WL 2604857, *2 (E.D. Mich. May 21, 2020) ("In this case, Defendant's age, together with his COPD, hypertension, diabetes, among other ailments, and the threat of COVID-19, satisfy [the extraordinary and compelling reasons requirement],"); *United States v. White*, Case No. 13 CR 20653-1, 2020 WL 2557077, *3 (E.D. Mich. May 20, 2020) ("Given [the defendant's] combination of underlying illnesses – hypertension and obesity – he is at risk of suffering dire medical consequences if he contracts COVID-19,"); *United States v. Cardena*, Case No. 09 CR 332-11, 2020 WL 2719643, *4 (N.D. Ill. May 15, 2020) (holding that the defendant's underlying conditions of hypertension and Type II diabetes, combined with the fact that he was close to release at the time of his motion, justified a finding of extraordinary and compelling circumstances); *United States v. Saad*, Case No. 16

CR 20197, 2020 WL 2251808, *4 (E.D. Mich. May 5, 2020) (holding that defendant's underlying conditions, including obesity and hypertension, satisfy the compelling circumstances requirement); *United States v. Rodriguez,* Case No. 16 CR 78-1, 2020 WL 1627331, *7-8 (E.D. Pa. Apr. 1, 2020) (holding that the defendant's underlying conditions, including hypertension and obesity, satisfied a finding of extraordinary and compelling circumstances).

Despite Mr. Booy's hypertension, his BOP medical records do not demonstrate a formal diagnosis and certainly do not reflect any treatment of the condition.[33] This is concerning because serious hypertension – when left untreated - can lead artery, heart, brain, and kidney damage.[34] More concerning is that the increased strain placed on the body from untreated hypertension can be exacerbated by the respiratory issues associated with COVID-19 infection. Untreated hypertension is not Mr. Booy's only concern.

Discussed at length above, Mr. Booy also suffers from OSA. Recent studies show a significant correlation with pre-existing OSA and severe illness after contracting COVID-19. Although Mr. Booy now has a CPAP machine to treat his OSA, it took months for health services to provide the machine. Since then, Mr. Booy has requested adjustments to the machine, which have been processed but not made. This lag time makes it likely that, moving forward, the staff at USP Marion will be equally delayed in replacing or fixing faulty or broken machine parts, or replacing filters within the machine. Mr. Booy is also not being provided distilled water for use with his CPAP machine, which is recommended by manufacturers of the devices as well as clinicians. Tap water may contain minerals and organisms which, when used in a CPAP machine, will put those minerals

---

[33] By way of proffer, Counsel has communicated several times with Mr. Booy on this issue. Mr. Booy states that, although medical staff have verbally indicated that he has hypertension they have not discussed any treatment plan or prognosis, and have not discussed or prescribed any treatments or medication.

[34] May Clinic, *High blood pressure dangers: Hypertension's effects on your body*, available at https://www.mayoclinic.org/diseases-conditions/high-blood-pressure/in-depth/high-blood-pressure/art-20045868 (last accessed June 15, 2020) ("Uncontrolled high blood pressure can lead to disability, a poor quality of life, or even a fatal heart attack or stroke,").

and organisms directly into one's lungs. Tap water also causes the CPAP machine to break down more quickly. As such, distilled water is recommended for use in CPAP machines, but is not being provided by USP Marion for Mr. Booy.

### c. The § 3553(a) Factors Weigh in Favor of Mr. Booy's Immediate Release

The § 3553(a) factors also weigh in favor of immediately releasing Mr. Booy. See 18 U.S.C. § 3582(c)(1)(A) (directing the court to "consider [] the sentencing factors set forth in section 3553(a) to the extent they are applicable,"); see also U.S.S.G. § 1B1.13(2) (advisory guideline suggesting one factor weighing in favor of compassionate release is that "the defendant is not a danger to the safety of any other person or the community,"). Mr. Booy has only served approximately 5 months of his sentence – a fact which is not lost on Mr. Booy. Mr. Booy's concern is becoming ill and dying, not escaping his sentence. Granting Mr. Booy's request and modifying his MSR to require home detention of any length this Court finds reasonable is sufficient "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense" under § 3553(a)(2)(A), while also considering the extraordinary situation in which Mr. Booy finds himself.

Even if Mr. Booy is released from custody, he will still owe substantial restitution of $1,439,677.94. Dkt. No. 90, p. 7. Should this Court agree with the instant arguments and order Mr. Booy's release, he will continue to owe that restitution and will be liable for paying that amount and having wages garnished for the next two decades. Mr. Booy urges this Court to consider that, should he be released, he will still be held accountable for his crimes for a very long time. Mr. Booy incorporates the arguments made in his sentencing submission related to § 3553(a) factors, and submits to this court that allowing compassionate release, or alternatively, recommending home confinement will provide a sentence not greater than necessary to achieve the purposes of sentencing.

### d. Recent Northern District of Illinois Precedent Supports Granting Mr. Booy's Motion for Compassionate Release

Courts in this district continue to grant motions for compassionate release when defendants have either exhausted their administrative remedies or the 30-day waiting period has lapsed, after finding that there were extraordinary and compelling reasons justifying release. *See United States v. Rana*, Case No. 09 CR 830-8 (N.D. Ill. June 9, 2020) (COVID-19 diagnosed defendant's 14-year sentence for providing material support of terrorism reduced to time considered served, where defendant suffered from several chronic health conditions); *United States v. Guzman*, Case No. 13 CR 576-1, 2020 WL 2781713, *1 (N.D. Ill. May 28, 2020) (granting motion for compassionate release for a defendant who had four years' imprisonment remaining, upon the condition that defendant's supervised release be modified to include home incarceration for the remainder of his original term of incarceration); *United States v. Body*, Case No. 18 CR 503-1, 2020 WL 2745972, *2 (N.D. Ill. May 27, 2020) (granting motion for compassionate release for a defendant who suffers from diabetes, thyroid issues, gout, arthritis, and high cholesterol, noting "[i]t was not and is not the Court's intention, in imprisoning [the defendant], to send him to his death or put him at a daily risk of serious bodily harm. That, however, is the reality that [the defendant] is facing today. Requiring him to be subjected to this severe risk for an extended period of time does not amount to just punishment, nor does it, in the Court's view, promote respect for the law,"); *United States v. Lewellen*, Case No. 09 CR 332-2, 2020 WL 2615762 (N.D. Ill. May 22, 2020) (a defendant with severe obesity, hypertension, and a heart condition granted compassionate release despite having completed only 57.6% of his 18-year sentence for drug trafficking). Accordingly, recent and applicable decisions in this district continue to support Mr. Booy's motion for compassionate release.

## IV.    CONCLUSION

For the foregoing reasons, Mr. Booy respectfully requests that this Court modify his sentence under 18 U.S.C. § 3582(c)(1)(A)(i) to time-served, or, in the alternative, recommend to the BOP that he be released immediately to home confinement pursuant to the CARES Act and 18 U.S.C. § 3621(b)(4).  If this Court recommends home confinement, Mr. Booy respectfully requests that he be permitted to self-quarantine at his sister's home and that he could serve any home detention during his MSR at the same residence.  Should this Court wish to hold a hearing, counsel waives Mr. Booy's appearance and asks that he be allowed to appear telephonically.

Respectfully submitted this 15th day of June, 2020.

_____/s/  Stephen F. Hall___
Stephen F. Hall

Attorney for Mr. Richard Booy

**Law Office of Stephen F. Hall**
53 West Jackson Blvd, Suite 1424
Chicago, Illinois 60604
312.858.4400/ stephen@sfhall.com